### THE ST. GEORG.

(District Court, D. South Carolina. June 28, 1899.)

1. SHIPPING—INJURY TO CARGO AFTER DISCHARGE—CARE REQUIRED OF CARRIER.

    The essence of every contract of affreightment is the engagement to deliver the goods to the consignee in good order; and provisions of a bill of lading that the goods shall be received by the consignee as fast as the steamer can deliver them, and that they shall be "at consignee's risk after they leave the ship's deck," cannot be so construed as to relieve the carrier from the duty to exercise reasonable care to protect the goods from injury under all circumstances until their actual delivery, and until the

consignee has had a reasonable opportunity to remove them after their discharge from the ship.

**2 SAME—NEGLIGENT EXPOSURE OF CARGO TO INJURY.**

A foreign steamer arrived at the port of Charleston with a cargo of rice in bags, about two-thirds of which was consigned to libelant. The agents of the vessel gave notice that she would discharge on the following day at a certain wharf, which was uncovered, and that all goods not removed by sunset would be stored at the risk of the consignees. At about 11 o'clock in the forenoon, when the ship had discharged on the wharf about 2,000 bags of rice, only a small part of which had been removed by the consignees, a heavy shower came up, and the rice remaining on the wharf was damaged. It was a season when rains were frequent. There had been rain on each of the three preceding days, and showers were predicted for that day by the weather bureau. It was shown that there were covered wharves at which the ship could have discharged, and at one of which she did discharge the remainder of the cargo without injury. No custom of the port as to the discharge of such cargo was shown. *Held* that, under the circumstances, the ship was negligent in discharging the rice on an exposed wharf so much faster than it could reasonably be removed by the consignees, without taking measures to protect it from injury, and that she was liable for the damages, it not being shown that libelant was guilty of contributory negligence.

In Admiralty. This was a suit in admiralty against the steamship St. Georg to recover damages for injury to cargo.

Smythe, Lee & Frost, for libelant.

J. N. Nathans, for respondent.

BRAWLEY, District Judge. The German steamship St. Georg arrived in Charleston on Thursday evening, July 21, 1898, laden with 4,989 bags of rice shipped from Bremen, of which 3,039 bags, freight whereon had been prepaid by shippers, were consigned to Wilmot D. Porcher, the libelant. On Friday the consignees were notified of the arrival of the ship, and that on Saturday she would be unladen at the South Carolina & Georgia Railroad wharf; her agents publishing in the morning newspaper on Saturday a notice, of which the following is a copy:

"Special Notices.

"Notice. Consignees of steamship St. Georg are hereby notified that she is this day discharging cargo at South Carolina and Georgia Railway wharf, and all goods left on wharf after sunset will be stored at their risk and expense.
"Charleston Transport Line.
"Street Brothers, General Agents."

Porcher sent his agent, Klinck, to attend to his consignment, and other merchants who had rice upon the same steamship had their agents likewise at the wharf. Klinck arrived at the wharf about a quarter to 8 o'clock, and had two drays there about that time. He had ordered other drays, but they did not arrive until about 11 o'clock. The ship began to discharge the rice from two hatches about half past 7 o'clock, at first piling it indiscriminately. Subsequently, upon complaint made, they undertook to separate the rice belonging to the different consignees into separate piles; but the testimony leaves it in doubt whether this was effectually accomplished, many of the witnesses saying that there was considerable confusion, and that the rice of the separate consignees was not all put in the same piles. The wharf at which the steamer was discharged was one of the

terminal wharves of the South Carolina & Georgia Railroad Company, and was uncovered. The testimony shows that it had previously been used for the lading and unlading of goods of a perishable character. There were some railroad cars upon the wharf, and also some piles of pig iron and resin for the outward cargo, which to some extent obstructed a free movement, and the entrance to the wharf was through a narrow gateway. At the shore end of the wharf there was a building called a "granary." Owing to the character of the wharf and to the obstructions, it is doubtful that a large number of drays could have been successfully handled upon it at the same time.

In the News and Courier of Saturday morning there was published a forecast of the weather, from the official United States weather bureau, as follows:

"Washington, July 22.

"Forecast for South Carolina: On Saturday, showers and thunderstorms; warmer northeasterly winds, becoming variable."

"United States Department of Agriculture Bureau.

"Charleston, S. C., July 22, 1898.

"Local forecast for Charleston and vicinity: Until midnight Saturday, light showers, with a probable moderate thunderstorm, followed by fair late in the day, stationary temperature; northeast to southeast winds, varying to east to south, and probably southeast to southwest winds; slightly warmer Sunday."

The testimony shows that it was the custom of the weather bureau to distribute this printed forecast generally throughout the city, and to post the same in about 50 places in Charleston. The testimony also shows that from the 20th to the 26th of July (both dates inclusive) there was rainfall every day. The morning of July 23d was clear, but a little before 11 o'clock there came up a thunderstorm and a heavy fall of rain, lasting a little more than an hour, nearly two inches of rain falling. It seems to have come suddenly, for Larsen, who was employed by the local agents of the steamship to supervise the unloading, had some tarpaulins on the wharf; but, before they could be put over the piles of rice, considerable rain had fallen thereon, and the rice was also damaged by water running on the wharf. There was some testimony that the tarpaulins were defective, but this was not proved. The damage was done by the rain falling before the rice was fully covered, and by the water running along the floor of the wharf, and from the sides of the piles being uncovered. When the rain was over, it was ascertained that considerable damage had been done to the rice by water, and everything that should properly have been done to minimize the loss seems to have been done by the libelant, with the co-operation of the agents of the steamship, although the latter disclaimed any responsibility in the premises. No rice was unloaded after the rain began, and the steamship was moved to another pier, where there was a shed, and the remainder of the cargo was there discharged. This libel is for the recovery of the damages caused by the rain.

Porcher's consignment was in nine lots, under separate marks, and was receipted for as such in the bill of lading, the pertinent parts of which are as follows: "Being marked and numbered as per margin,

and to be delivered subject to the terms and conditions stated in this bill of lading, which states the contract between the shippers and the company, in like apparent good order and condition, from the ship's deck, where the ship's responsibility shall cease," at the port of Charleston. It contains a stipulation giving the carrier the right "to discharge the goods from the steamer as soon as she is ready to unload into hulk or temporary depot or lighter, or on a wharf, at the shipper's or consignee's risk or expense, after they leave the ship's deck. The goods to be received by the consignee as fast as the steamer can deliver them, and any extra charges incurred after being discharged, necessary for the steamer's quick dispatch, to be paid by the owner or consignee of the goods." There is a further stipulation that, "in the event of the carrier or carriers becoming responsible for damage to or loss of other goods in their custody, such loss or damage to be calculated on the first cost of the goods, with the addition of freight and charges at port of shipment, but excluding commissions, interest," etc., and a stipulation that "the carrier or carriers will not be responsible for losses of any kind which may arise in consequence of the custom-house laws or directions at the port of destination." No testimony has been offered to show the custom or usage of the port with respect to the unlading of cargoes of rice, though it appears that a cargo of rice from the steamship Dalmatia, then commanded by the present master of the St. Georg, was unloaded at an uncovered wharf of the South Carolina Terminal Company some months before; but this rice was transported immediately from the ship's side, underneath a shed, and delivered to Porcher from that point. Testimony respecting a single transaction would not be sufficient to establish a custom. There was some testimony tending to show that the wharf where the St. Georg discharged cargo was selected in deference to Porcher's wishes. One of the clerks of Street Bros. had a casual conversation on the street with Porcher's bookkeeper, who said to him that the discharging at the South Carolina Terminal Company's wharf, where the Dalmatia had been unloaded, involved too long a haul, and asked if it could not be arranged otherwise. The weight of the testimony, however, goes to show that the selection of the wharf was for the ship's convenience, and that it was not affected by this conversation with the bookkeeper, who had no duties to perform in connection with receiving cargo, and had not been directed to discuss the matter. One of the South Carolina & Georgia Company's wharves had a shed over it, and Porcher testifies that he believed that the St. Georg was to be unloaded at that wharf; but the testimony shows that the covered wharf was used exclusively by the Clyde line of steamships, and that this was generally known. Porcher's agent, Klinck, who was attending to the business, of course knew when he arrived that the ship was being discharged at an uncovered wharf, and there was no protest from him or from any of the other consignees. Porcher did not arrive at the wharf until a few minutes before the rain, when he was summoned by telephone in connection with the weighing. It was the custom of the port for the custom-house officials to weigh each sack of rice, when so requested by the

consignee; but sometimes, by consent of consignees, only 10 per cent. of the sacks were weighed. Porcher's agent had requested the weighing of each sack, and the custom-house official was thus weighing it. As he can only weigh 60 or 70 sacks an hour, this involved considerable delay; and Porcher was summoned to see if the weighing of each sack could be dispensed with, and thereafter consented to that method. The rain was imminent when Porcher returned to his office, and he wrote to the agents of the steamship, protesting against the rice being discharged upon an uncovered wharf. As this letter was not delivered until after the damage was done, it can have no bearing upon the point to be determined. This correspondence related mainly to measures necessary to be taken to minimize the loss, and, as it is not charged that anything was done or omitted which could have repaired the damage after that time, it need not be further considered. About 2,040 sacks of rice had been unloaded before the rain commenced, and Porcher had removed two truck loads, containing 40 bags, and Schirmer, another consignee, had removed 166 bags. About 1,466 bags of Porcher's rice was more or less damaged by the rain, and the damage proved was about $^{52}/_{100}$ of a cent per pound.

It has been earnestly contended on behalf of the claimants that, if Porcher had sent all of his drays to the wharf earlier in the day, the whole or greater part of his rice could have been removed before the rain. That is the most important question of fact to be determined. It is a very serious question, and the testimony is not so clear as to render a conclusion free from doubt. The rapidity with which the bags of rice were unloaded upon the wharf; the mixing up of the rice belonging to the different consignees; the necessity of weighing it; the difficulty of segregating the sacks belonging to the separate consignments; the crowded condition of the wharf, rendering it impracticable to handle a large number of drays thereupon at the same time,—all of these conditions make it doubtful whether the rice of this libelant could have been removed before the rain commenced. That more of it could have been removed than was actually taken away is probable, if extraordinary diligence had been shown by the consignees, but the testimony fails to show clearly that the consignee was so far lacking in ordinary prudence as to render him justly chargeable with contributory negligence. This is a case of a foreign vessel, and courts of respectable authority make a distinction between the foreign and inland trade, holding carriers in the latter to a more stringent rule as to the delivery of the goods. The exigency of this case does not require an examination or decision whether there is any sound reason in principle for this distinction. The obligation of foreign vessels usually is simply to convey from port to port. It is generally determined by the bill of lading, which constitutes the contract between the parties; and well-known usage as to the mode of delivery may be said to enter into the contract, and become a measure of their rights and liabilities. There is also a well-known distinction between the liability of a common carrier, strictly as such, and his liability after he has devested himself of that character, though he may still have the custody of the prop-

erty; but it would not be profitable to consider such distinctions, as in either character he would, upon well-settled principles, be held to the exercise of ordinary care and diligence.

The precise question to be determined is whether, under all the circumstances of this case, the ship was so far devested of all responsibility for the care and custody of the goods that the admitted loss must rest where it fell. The line which separates the liability of the ship from the liability of the consignee is a very narrow one, and the large number of cases cited upon both sides does not mark it with that absolute clearness which leads to an infallible conclusion. It will serve no useful purpose to review all of these cases, but it is due to the industry of counsel that they should have the assurance that each case has been carefully read and considered; and, in stating my conclusion,—reached not without misgivings,—I have had the ever-present comfort that a more enlightened tribunal may correct it, if in error.

The essence of every contract of affreightment is the engagement to deliver the goods to the consignee in good order, and the objects of commerce would be defeated if any stipulation in the bill of lading, which constitutes the contract, was given such construction as would permit the exposure of the goods to any unnecessary hazard or obvious peril of injury or destruction. The loss caused by a sudden storm and downpour of rain does not fall within the scope of the phrase "the act of God," which is one of the exceptions in the bill of lading; for, to constitute the peril contemplated by that exception, it would be necessary to show that the damage was due to some inevitable necessity, which was beyond the control of human agency, and that no act of omission or of commission contributed thereto. Nor does the stipulation that the goods are at "owner's risk" justify exposure to probable peril. These words cannot be extended by implication beyond their fair meaning and necessary import. They cannot be read so literally as to frustrate the beneficial objects of the transaction to which it relates, or to shield the carrier from the consequences of his own negligence, so long as the goods are within his control. A mere unloading does not of itself constitute delivery, if they are still subject to the risks of transportation. The phrase that the goods shall be "at consignee's risk and expense after they leave the ship's deck" cannot be construed to mean that they could be landed instantly, and without regard to circumstances, at a place and time where they would be more exposed than when on the ship's deck. These terms do not purport to relieve the ship from her previous agreement to deliver the bags of rice "marked and numbered as per margin," and "in like apparent good order and condition," nor absolve her from the general maritime duty to take reasonable care of them in all situations. The obligation to deliver in good order and condition is incompatible with the broad exemption claimed under this special clause. The landing of the rice on the wharf would be a constructive delivery only, and would terminate the liability of the carrier only after reasonable opportunity had been given for its removal. If the consignee fails to appear, and neglects to remove, the master cannot abandon the goods to probable destruction. He is re-

sponsible for reasonable care, and may hold them subject to the modified responsibility of a bailee, or store them on shipper's account, and there is the legal duty on the ship to exercise all reasonable and appropriate care for the safety of the goods until the legal delivery to consignee is effected. A mere "discharge" of cargo is not delivery, and, unless there is a valid substituted delivery, the responsibility of the carrier does not terminate until actual delivery. This stringent liability of the carrier is not to be continued at the option, or to suit the convenience, merely, of the consignee, whose duty to receive is as imperative as is the duty to deliver. The just requirements and convenience of the ship in respect to economy and dispatch are to be protected. Until the lapse of reasonable delay, the amount chargeable for freight would include proper charge for storage, but, after the consignee has had reasonable opportunity to remove the goods, if he fails to do so the carrier can store them at his expense; and in this case the ship's agents gave notice on the morning when the unlading was commenced that, if the goods were not removed by sunset, they would be stored at the risk and expense of the consignees. While the separate clauses in the bill of lading constitute the contract between the parties, and express the conditions upon which the carrier assumes the duty of transporting them at the rate of compensation therein expressed, all these clauses must be reasonably construed. It is the duty of the consignee to watch for the arrival of the ship and to be in readiness to receive. It is the duty of the ship, if practicable, to give notice of intended discharge. If, by the terms of the bill of lading, the ship has the right to discharge at a wharf, it is its duty, in selecting a wharf, to have regard to its obvious condition with respect to the length of time the cargo is likely to remain upon it. In discharging perishable goods, obvious prudence would suggest that an uncovered wharf should be eschewed, when others were available, for reasonable care demands that no known or probable risk should be unnecessarily incurred. The consignee should have opportunity by reasonable diligence to identify his property, and each consignment should therefore be so separated that it would be conveniently accessible for purposes of such identification and removal. To constitute a valid substituted delivery, it was the duty of the ship to deliver at a suitable wharf, at a suitable time, and to give the consignee fair opportunity to remove it. The testimony shows that there had been rainfall every day for the three preceding days, and that the weather bureau predicted a thunderstorm and rainfall for that day. A ship cannot be compelled to lay idle, when prepared to unload, because the consignees apprehend that there may be a storm in the course of the day. It is sufficient, if, in view of all the circumstances, a reasonable discretion is exercised; but it seems to me that the unloading, upon an uncovered wharf, of a cargo liable to injury from rain, in the condition of the weather on that day, and in view of the predictions of the weather bureau, fell short of that requirement of reasonable prudence. It cannot be claimed that meteorology is an exact science. The predictions of the weather bureau cannot always be accepted as absolute verity, and we jeer at it when unheralded storms bring devastation and when its forecasts are not

fulfilled. The mechanics of storms, those vast and subtle forces of the air which give rise to atmospheric disturbances, and supply the energy needed to continue them, are still little understood; but the forecasts and reports of the weather bureau are regarded of sufficient consequence to permit their acceptance as evidence, and the seafaring man cannot be absolved from the charge of carelessness and temerity if he fails to give heed to its predictions. Its forecasts and warnings, so far as they can be obtained by surface reading only, have reached a high degree of accuracy; and, as the extent of the area from which its reports are received is extended, its value has been enhanced. It is a distinguishing characteristic of the lower South Atlantic Coast that a period of heavy rainfall may always be expected in July and August, and no extraordinary acumen is required to predict the same. Under these circumstances, I must hold that the landing of a large cargo of rice upon this uncovered wharf in the face of a threatened storm, without making abundant and effective preparations for protecting it for such a period of time as would afford the consignees fair opportunity to remove it, was an act of culpable carelessness, not justified by any necessity; for other and covered wharves were available, as is proved by the evidence and the fact that the ship was removed to a covered pier and discharged the remainder of her cargo without damage. I must hold, further, that it has not been proved to my satisfaction that the consignees had fair opportunity to examine the rice, to separate it, and remove it, before the rain commenced. The testimony which tends to show that the consignee was negligent in not removing the rice with sufficient rapidity falls short of the required proof, for a party clearly in fault, in order to relieve himself of the liability therefor, must make it equally clear that the party seeking relief is himself to blame for not avoiding the consequences of that fault. Courts of admiralty, in giving or withholding damages, are not circumscribed within the strict boundaries of courts of law, but are habitually governed by enlarged principles of justice and equity, and it has been a question of serious concern whether the consignee was so far free from blame that a court could justly, in the exercise of a conscientious discretion, award the full measure of damages claimed; but to entitle the ship, found to be in delicto, to such relief, the proof of fault in the libelant should be stronger than the testimony affords. It follows that a decree must be entered for the libelant for damages; the amount to be settled hereafter, if not agreed upon.