AMERICAN HOESCH, INC. and Riblet Products, Inc., Plaintiffs,

v.

The STEAMSHIP AUBADE, her boilers, engines, tackle, apparel, and her furniture, and Maritime and Commercial Corp., Inc., Defendants.

Civ. A. No. 69–1044.

United States District Court,
D. South Carolina,
Charleston Division.

Sept. 11, 1970.

Julian H. Toporek, Charleston, S. C., for plaintiffs.

B. Allston Moore, Jr., of Moore, Mouzon & McGee, Charleston, S. C., for defendants.

**1194**

## ORDER

HEMPHILL, District Judge.

Defendants move for summary judgment placing reliance on the time-for-suit provisions of 46 U.S.C. § 1303(6), which provides:

> * * * In any event the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered: *Provided,* That if a notice of loss or damage, either apparent or concealed, is not given as provided for in this section, that fact shall not affect or prejudice the right of the shipper to bring suit within one year after the delivery of the goods or the date when the goods should have been delivered.

> In the case of any actual or apprehended loss or damage the carrier and receiver shall give all reasonable facilities to each other for inspecting and tallying the goods.

There is no dispute but that the time-for suit clause of the United States Carriage of Goods by Sea Act is of its own force and effect applicable to the transportation here involved. If applicable to the facts surrounding the present shipment, the clause would effectively extinguish the cause of action itself and not merely the remedy. M. V. M., Inc. v. St. Paul Fire & Marine Insurance Co., et al., 156 F.Supp. 879 (S.D.N.Y.1957), citing Midstate Horticultural Co., Inc. v. Pennsylvania Railroad Co., 320 U.S. 356, 364, 64 S.Ct. 128, 132, 88 L.Ed. 96 (1943). The question becomes one crucial to plaintiffs' claim, as the lapse of the specified time would destroy the liability of defendants if the statute applies.

On December 9, 1969, plaintiffs filed suit in the District Court of South Carolina claiming damages in the amount of Six Thousand Eight Hundred Fifty-Seven and 40/100 ($6,857.40) Dollars against defendant ship[1] and carrier for damage, while in transit from Antwerp to Charleston, to 162 bundles of light steel beams consigned to plaintiff. Allegedly the claim is within the admiralty and maritime jurisdiction of this court, which is not disputed.

Defendant's[2] answer denies much of the complaint, especially that the damage occurred aboard, and alleges the cargo involved was discharged from the vessel December 8, 1968, more than one year prior to commencement of suit, and offers supporting exhibits. If the goods were *delivered,* or *should have*[3] *been delivered* [emphasis added], more than one year prior to December 9, 1969, the motion for summary judgment should be granted and the flame of plaintiff's claim forever extinguished; otherwise plaintiff can pursue.

Allegedly supporting defendant's claim are two bills of lading, zeroxed copies of which are included in and attached to defendant's answer. These show that Cobelfret Lines, general agents, of Antwerp, engaged to ship from Antwerp to Charleston, aboard the ocean vessel Aubade certain bundles said to contain steel pieces. No date is given. The bill of ladings show[4] the goods are to be "carried and delivered * * * at the port of final destination above named, or as near thereto as she can, without detention or delay, safely get, always afloat, unto the above mentioned consignee or to his or their assign." The contain steel pieces. No date is given. the notifying address is "R. B. COMAR,

---

1. As hoary as the classic nautical aphorism of the seaman's lien for wages extending to the last plank, the notion is deeply ingrained that once the cargo is aboard, the cargo is bound to the ship and the ship is bound to the cargo. Responsibility of the vessel, and not her distaint, unavailable, inaccessible owner or without reliance on the present of some impecunious, irresponsible, temporary user,

serves a useful purpose in the law. Compagnie De Navigation etc. v. Mondial United Corp., 316 F.2d 163, 173 (5th Cir. 1963).

2. Maritime & Commercial Corp., Inc., owner of the Steamship AUBADE.

3. Not apropos to this determination.

4. In small print and difficult to read.

P. O. Box 800, Charleston, S. C. 29402." No date appears thereon.

Also attached to the Answer are two "tally sheets" which purport to show an offloading from hatch 4 of the Aubade to the "Apron" [presumably on the dock] of the bundles in question on the date of 12–8–68 and which show as exception:

"ALL BDLS RUSTY
All bdls all pcs bent
2-bdls. adrift"

As to one and similar indication of possible [5] enroute damage to the other. In each "tally sheet" is included "Received the above listed cargo in apparent good order and condition except as noted", signed, "South Carolina Ports Authority. By Holmes date 12/11/68."

The South Carolina Ports Authority is not a party to the action [6] and neither party has attempted to demonstrate the status of the allegedly damaged goods from the date of their unloading, December 8, 1968, until the date of receipt by the Ports Authority, which was presumably December 11, 1968. It appears from the affidavit of the husbanding agent for the defendant that the offloading was accomplished by an independent stevedoring concern employed by the vessel. The record does not show nor were counsel aware of the relationship of the Ports Authority to the parties, whether it was the agent of one or the other or whether merely warehouseman, and what, if any, effect the relationship of the Ports Authority to the parties has upon the question of when the one-year period for bringing suit begins to run.

The defendant simply takes the position that the one-year time limitation begins to run with the discharge of the goods. In support of that position he relies upon the following language in C. Tennant Sons & Co. v. Norddeutscher Lloyd, 220 F.Supp. 448 (E.D.La.1963):

Section 2 of the Act, 46 U.S.C. § 1302, sets forth the duties, rights, responsibilities and liabilities of the carrier and lists the chronological coverage of the Act, i. e. the ' * * * loading, handling, stowage, carriage, custody, care, and discharge of such goods. * * *' Inasmuch as the duties, rights, responsibilities and liabilities of the carrier terminate upon the discharge of such goods it stands to reason that the limitation period set forth in Sec. [1303(6)] commences at that period of time.

A fortiori when considered in the light of § 1(e) 46 U.S.C. § 1301(e) supra, which grants coverage until the goods * * * are discharged from the ship. Since [T]he Carriage of Goods by Sea Act does not apply of its own force to cargo after it has left the ship's tacke' [cite omitted], it seems reasonable to hold that delivery into the compartments [of the lighter], while not an actual delivery to libellant, was a constructive delivery sufficient to initiate the running of the limitation period.

In the *Tennant Sons* case the goods were unloaded directly into barges provided by the plaintiff to continue to their ultimate destination up the Mississippi from the point of discharge from the carrier. That discharge into the

---

5. This issue not decided. The court can only surmise at the possible merit of the claim.

6. It is uncertain whether the South Carolina Ports Authority can in fact, under the Eleventh Amendment, be made a party defendant to an action in the District Courts. It appears that power to sue and be sued in the statutory language creating the Authority (S.C.Code Ann. §§ 54–1 through 54–64 (1962)) does not constitute a waiver of Eleventh Amend-

ment immunity (Dupont v. S. C. Public Service Authority, 100 F.Supp. 778 (E.D. S.C.1951)), and that if such immunity has indeed been waived by the state that waiver arises from the nature of the activity conducted by the Ports Authority. (C. Itoh & Co. (America) Inc. v. S. S. Freedom, et al, C.A. No. 70–208, D. S.C. (Sept. 3, 1970); See also Chesapeake Bay Bridge & Tunnel District v. Lauritzen et al., 404 F.2d 1001 (4th Cir. 1968).

barges of the consignee was held to constitute "delivery" within the meaning of Section 3(6) of the Carriage of Goods by Sea Act (46 U.S.C. § 1303(6)).

As pointed out in the *Tennant Sons* opinion, there is some inconsistency between Section 2 of Carriage of Goods by Sea Act (46 U.S.C. § 1302) and Section 3(6) of that Act if the one-year period does not begin to run when the responsibility of the carrier under the Act is terminated. Where, as in that case, the facts show delivery to an agent of the consignee at the time of discharge, the time period does begin to run with the discharge. However, Section 3(6) designates the commencement of the one-year as the *delivery* of the goods. Section 2 used the word "discharge" in defining the scope of the Act. The defendant does not contend that the two terms in normal use or legal definition have the same meaning. Rather he urges that in this context it is reasonable that the intent was that they be considered synonymous. This court finds that it is more reasonable to conclude that the term "delivery" as used in Section 3(6) of the Act to mark the beginning of the time period is not synonymous with "discharge". The former term denotes a two-party transaction in which the consignee or an agent would have the opportunity to observe defects and the latter term need involve only the shippee and there might or might not be opportunity for the consignee to discovery the damage at that point. Discharge and delivery need not occur at the same time and only at delivery must there be opportunity for potential plaintiffs to discover damage. As the statute used the term "delivery," there can be no question that delivery is in fact the act required to begin the running of the time period.

There remains only consideration of whether the record shows that, as a matter of law, delivery of the goods in question was made on or before December 8, 1968. "Delivery" is a concept which has been subject of considerable litigation in several areas of the law. It appears from the discussion of it considered by the court that delivery implies mutual acts of the carrier and the consignees. Ostrandes v. Brown, 15 Johns 39, 8 Am.Dec. 211 (N.Y.1818). It is a more inclusive term than "unloading",[7] implying acceptance or agreement to accept by [8] or, at least communication to, the consignee, if not actual passing of possession to the consignee, coupled with relinquishment of possession or control by the carrier.[9] The mere discharge of the cargo is not delivery.[10] This record in its present posture shows only that the goods were unloaded on December 8, 1968. The stevedore was the ship's agent. There is nothing to show that the Ports Authority, if it indeed was the agent of the consignee, acquired possession or control of the goods until December 11, 1968.[11] This action was filed December 9, 1969 and, upon the present record, it cannot be determined that delivery of the goods was made more than one year prior to that date.

The record presently before the court fails to show if, and when, the ship lost control of the goods. Similarly, it is silent as to the time, place of, and circumstances surrounding, consignee's obtaining control. The term "delivery" is not synonymous with control, but delivery implies a change of possession, a change of control. It may be that upon trial of the matter, the defendant

7. American Oil & Supply Co. v. U. S. Casualty Co., 19 N.J.Misc. 7, 18 A.2d 257 (1940).

8. Seaboard Air Line Ry. v. Friedman, 128 Ga. 316, 57 S.E. 778 (1907).

9. Glouchester Mut. Fishing Ins. Co. v. Hall, 210 Mass. 332, 96 N.E. 679 (1911).

10. The St. Georg, 95 F. 172, 177 (D.S.C. 1899).

11. Presumably the wharf onto which the beams were unloaded is the property of the Ports Authority. However, as the receipt of the Ports Authority is dated December 11, the court could only speculate as to the custody and control of the goods during the period from December 8 until December 11.

will show that delivery was completed on December 8, 1968. At this point he has not done so.

Wherefore, the defendant's motion for summary judgment is denied.

And it is so ordered.