SOUTHERN GROCERY COMPANY *v.* BUSH, RECEIVER ST. LOUIS, . IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY.

Opinion delivered October 22, 1917.

1. APPEAL AND ERROR—DIRECTED VERDICT.—In testing the action of a trial court in directing a verdict, the Supreme Court will review the evidence offered against the verdict, and will give it its highest probative value, including all inferences reasonably deducible **therefrom.**

2. CARRIERS—DESTRUCTION OF FREIGHT BEFORE DELIVERY—JURY QUESTION.—Cotton was shipped over the line of defendant carrier, consigned to appellant. At its destination defendant delivered the cotton to a compress company; the building of the latter company was destroyed by fire, and the cotton with it. Appellant sued defendant (appellee) for damages for the loss of the cotton. *Held,* it was a question for the jury, whether the compress company acted as the agent of the appellant or the appellee, before the appellee had give the cotton a clearance, for if it was agent of the appellee, then the latter was liable for the loss, and if it was the agent of the appellant, the carrier would not be liable; and that the trial court erred in directing a verdict for the appellee.

3. CARRIERS—LOSS OF FREIGHT—TIME OF LIABILITY.—The liability of a carrier for loss of freight after arrival at destination may extend beyond what is ordinarily a reasonable time, where the consignee is, without fault, prevented from removing the goods, by reason of some act or omission of the carrier.

Appeal from Jefferson Circuit Court; *W. B. Sorrells,* Judge; reversed.

*Bridges, Wooldridge & Wooldridge,* for appellants.

1. The liability of defendant as a common carrier had not terminated upon delivery to the compress company, but continued until the railway company had issued its release or clearance for the cotton. It was proven that the railway company had established a custom of requiring consignees, before they could get cotton shipped to them, from the compress company, to pay the freight charges and then the railway company would issue its release or clearance. It was the fault of the railway company that the cotton was not delivered to appellant before the fire. Appellants were offering to pay the freight and asking for a release.

If the compress company was the agent of the railway company, delivery to it was not delivery to appellants and the carrier is liable. The question should have been submitted to a jury, and it was error to direct a verdict. 90 Ark. 70, 72; 89 *Id.* 591; 81 *Id.* 549; 100 *Id.* 37, 42; 109 *Id.* 218; 60 *Id.* 375; 4 R. C. L. 758; 40 Pac. 899; 37 Am. Dec. 434; 95 *Id.* 656; 17 N. W. 351; 79 Ala. 395; 90 N. Y. 267; 2 Hutch. on Car. 788; 124 Ark. 490; 60 *Id.* 333, 339.

2. The contract between appellee and the compress company was inadmissible. Nor was it binding on appellants. 2 Elliott on Contracts, 661; 87 N. E. 21; 34 C. C. A. 363; 106 Ark. 411, 49 N. Y. 464.

*E. B. Kinsworthy, W. G. Riddick* and *R. E. Wiley,* for appellee.

1. There was an actual and complete delivery of the cotton, the carrier retained no custody of it and no power to control and direct disposition of it for any purpose. 35 N. W. 718, 721, 95 U. S. 43; Michie on Car., § 3649; 44 N. W. 1120; 104 U. S. 146; 38 Minn. 95; 106 Ark. 410, etc.

2. The fact that appellee assumed to control or actually did control the disposition of the cotton after delivery to the compress company to secure payment of its charges would not continue the carrier's strict liability. 35 N. W. 718; 44 *Id.* 1120. See also Michie on Carriers, 1154, 1161; 56 Ark. 430; 112 *Id.* 301.

3.  The contract between appellee and the compress company was competent. Michie on Carriers, p. 590; 70 Alt. 232.

No negligence or fault was proven and a verdict was properly directed.

SMITH, J.  Two suits are embraced in this appeal, both of which were brought to recover damages from appellee on account of the failure of the railway company to deliver certain shipments of cotton. The causes were consolidated and tried together, and are treated in the briefs as a single case.

Two consignments of cotton were shipped to appellant, the first consisting of thirty-one bales, and designated as the Peacock cotton. The second consisted of fifty-three bales, and is referred to by the witnesses as the Mears cotton. The Peacock cotton was received in Pine Bluff on November 16, 1915, and was delivered by the railway company on that day to the Pine Bluff Compress & Warehouse Company. The Mears cotton was delivered to the same compress company on November 26, 1915. This compress company's warehouse, together with the cotton herein sued for, was destroyed by fire on November 28, 1915. It is not contended that the railway company was guilty of any negligence in the destruction of the cotton, but liability is sought to be enforced against it as a carrier, upon the theory that there had been no completed delivery of the cotton to the consignee at the time of the fire.

The bills of lading under which both consignments were shipped contained the following clause: ''For loss, damage or delay caused by fire occurring after forty-eight hours, exclusive of legal holidays, after notice of the arrival of the property at destination, or at port of export (if intended for export), has been duly sent or given, the carrier's liability shall be that of warehouseman only.''

The Peacock cotton had been in the warehouse for twelve days at the time of the fire, and appellant had actual knowledge of that fact during all that time. The

Mears cotton, however, had only been received on Saturday afternoon before the fire occurred on the following day at about 3 :45 p. m., and no notice of its arrival had been communicated to the consignee before its destruction. However, both shipments had been actually delivered to the compress company pursuant to a general direction from appellant to so deliver its cotton.

Over appellant's objection, there was offered in evidence a contract between the railway company and the compress company, wherein it was agreed upon the part of the compress company, that it would receive at its own risk cotton consigned to consignees who stored their cotton in its warehouse, and that it would assume responsibility for loss of or damage to cotton so delivered to it by the railway company. The action of the court in admitting this contract is assigned as error by appellant, upon the ground that it was not aware of nor a party to the contract, and that its right to assert a demand against the railway company as a carrier can not be affected by a contract which the railway company had with a third party to assume liability which would otherwise rest upon the railway company.

It is admitted that the compress company was engaged in the business of receiving and storing cotton for customers, on terms agreed on between them, and that appellant was a cotton factor and had made arrangements with the compress company to receive from the railway company cotton consigned to appellant and to store it in consideration of the customary charges and hold it for appellant until it was sold and ready for delivery by appellant to the purchasers in the ordinary course of its business. It was the practice of the compress company to take samples of all cotton stored with it and to send these samples immediately to the consignee, and that these samples were used in making sales of the cotton, and it is also shown that samples of the Peacock cotton had been delivered to appellant pursuant to this custom.

Appellant requested the court to give an instruction numbered 3, which presents its theory of the case. That instruction reads as follows:

"3. If you find from the evidence that under the rules and custom of the defendant, as receiver of said railway company, as to the delivery of cotton, that straight shipments of cotton, that is, not to shipper's order, were treated as shipments to shipper's order, and before the cotton would be delivered to the consignee he was required to pay the freight thereon and delivered the bill of lading therefor to defendant's agent and get from such agent a clearance showing the payment of the freight bill upon said cotton and a delivery of the bill of lading therefor, and that said rule or custom of said railway company was in force at the time the cotton sued for was burned and had been in force for a long time prior thereto, and that said cotton would not be delivered to the consignee without a compliance with such rule or custom, then there was no delivery of said cotton to the consignee until he had complied with such rule or custom. Therefore, if you find from the evidence in these cases that the cotton sued for was delivered to the Pine Bluff Compress Company at Pine Bluff, Ark., by the defendant as receiver of said railway company and before the cotton would be delivered to the Southern Grocery Company, it was required under the rules or custom of said defendant, to pay the freight on said cotton and to surrender the bill of lading therefor to the agent of said defendant and to get from such agent a clearance showing the payment of the freight and the surrender of the bill of lading therefor and then was required to present such clearance to the agent of the compress company before the compress company would deliver the cotton to the plaintiffs, Southern Grocery Company, and this had not been done before the cotton was destroyed by fire, then there was no delivery of said cotton to the Southern Grocery Company by defendant, and you should find for the plaintiffs, unless you should find from a preponderance of the evidence that the compress company in receiving said cotton

from defendants was acting as the agent of the Southern Grocery Company.''

The court refused to give this instruction, but, upon the contrary, directed the jury to return a verdict in favor of appellee, and this appeal has been prosecuted to reverse the judgment pronounced upon the verdict so rendered.

Appellee seeks to justify this action of the court upon two grounds. The first is that there was an actual and complete delivery of the cotton; that the railway company retained no custody of it and no power to control and direct its disposition for any purpose. And upon the second ground that the fact, if true, that the railway company did assume control, or even actually did control, the disposition of the cotton, after its delivery to the compress company, would not make it liable to appellant as a carrier, because such control was for the purpose merely of securing the payment of its freight charges, and that the retention of control for this purpose would not, and did not, operate to make it liable as a carrier.

The railway company calls attention to the fact that it was the intention of the appellant, even if it had gotten the clearance from the railway company for the cotton, to leave the cotton stored in the warehouse of the compress company until the same was sold, and there was testimony on the part of an officer of the compress company that that company would have issued warehouse receipts for the cotton upon the presentation to it either of the clearances from the railway company or the surrender to it of the bills of lading together with a guaranty to pay the freight on the cotton therein covered. The railway company, therefore, insists that under this proof the verdict was properly directed in its favor, on the theory that there had been an actual physical completed delivery of the cotton to the consignee.

(1)  In testing the action of a trial court in directing a verdict, we are required to take the evidence offered against the verdict, and to give it its highest probative value, including all inferences reasonably deducible therefrom.

(2)   In the excellent brief filed in behalf of the railway company, it is assumed that the compress company was, in fact, the agent of the consignee, and if this concession is made, it must necessarily follow that the verdict was properly directed.   But this admission is not made; in fact, the controversy over the agency of the compress company is the essence of this lawsuit.  And if the evidence on this subject is not undisputed, and if it may be reasonably inferred from this evidence that the compress company was in fact the agent of the railway company in holding the cotton, then that question should not have been taken away from the jury.

It was shown, and not denied, that for many years the railway company had the practice of issuing clearances to the consignees of cotton which it had delivered to the compress company.  These clearances recited the point of origin of the shipment, the marks upon the cotton, and the number of bales, and the other evidences employed for the identification of the cotton, and concluded with the following statement: "The owner of the above cotton having accepted control of same, you will please discontinue reporting same to this company for insurance protection for our account after midnight above date."

The manager of the appellant company, and other large handlers of cotton at Pine Bluff, testified that it was the custom of the railway company, without exception so far as they were advised, to issue this clearance for cotton after the same had been checked up and it was found that the freight had been properly paid, and that these clearances were delivered to the agents of the compress company, whereupon those agents issued to the consignees warehouse receipts showing that the compress company held for the account of the respective consignees the bales of cotton of the weights, numbers and marks indicated in the warehouse receipts.   It is shown, and not denied, that it was the custom of the appellant company to send its representative to the office of the freight agent of the railway company and to check up with that officer the cotton which had been received in Pine Bluff

for appellant, and for this representative of the appellant to issue checks in payment of the freight thereon. It is shown that this representative of appellant, after being advised of the receipt of the Peacock cotton, applied at the office of the freight agent on each morning after the receipt of the cotton, until the Saturday before its destruction, for the clearance, and tendered to this freight agent the amount of freight due upon this consignment. It was known by the freight agent that appellant's representative desired this clearance for the purpose of obtaining warehouse receipts from the compress company, and appellant says that, under the rule of the railway company, which had long been effective in Pine Bluff, the clearance was essential to obtain the warehouse receipts from the compress company. At any rate, because of a discrepancy in the marking of one of the bales of this cotton, the railway company persisted in its refusal to issue the clearance, and as a result thereof no warehouse receipts were ever obtained therefor. It is true that the cotton had been stored where appellant desired it to be stored, and that samples thereof had been furnished appellant. But is fairly inferable from this testimony that this was tentatively done upon the assumption that appellant would, pursuant to its usual practice, obtain the necessary clearance from the railway company.

We think it is not of controlling importance in this case that the cotton was, in fact, stored where appellant would have stored it if no controversy had arisen over the clearance and no difficulty had been encountered in obtaining the warehouse receipt. We think the test is whether the consignee could have removed the cotton had it desired to do so. In other words, was the clearance essential for the actual delivery of the cotton to appellant. Would the compress company have made such a delivery without the production of the clearance as a matter of right, and not as a mere matter of accommodation upon the assumption that the consignee was entirely solvent and responsible and would hold the compress company harmless from any damage resulting from the failure

of the compress company to comply with the railway company's requirement? And we think the record in this case presents the question of fact whether otherwise the compress company would have surrendered the cotton or issued warehouse receipts for it in the absence of the clearance, for, in answer to the question propounded by the court, "Would you have delivered that cotton to the Southern Grocery Company (appellant) without that clearance?" the witness Daily, who was manager of the compress company, answered "No, sir."

Witnesses for appellant who are large handlers of cotton at Pine Bluff testified that the custom of the railway company to require the clearance from it was adopted by the railway company for its own protection and to insure the payment of its freight charges, and that so far as their experience went, warehouse receipts from the compress company could not be obtained without the exhibition to the compress company of the clearance. We think, therefore, that the jury might have found that, for its own purposes and protection, the railway had adopted a rule, the enforcement of which by its agent rendered the compress company the agent of the railway company until the rule or custom of the railway company had been complied with. It will be borne in mind that the railway company was not withholding its clearance for the purpose of collecting its freight charges, for a tender had been repeatedly made of these charges, but that the basis of its refusal was that the number on one of the bales of cotton did not correspond with the number on the bill of lading.

(3)  At page 395, Section 8, Vol. 1 (2nd Ed.) of Moore on Carriers, it is said: "Where goods, after arrival at their destination, have been applied for or demanded, but are refused or detained by the carrier, except where the goods are properly held for freight charges due, the carrier's liability as an insurer of the goods may be extended beyond what would ordinarily be a reasonable time and be continued until a reasonable time after the goods have been offered for delivery to the consignee. The carrier's liability as a common carrier continues with-

out regard to the time the goods may have actually been
ready for delivery, where the consignee is prevented,
without fault on his own part, from removing and caring
for his goods by reason of the failure of the carrier to
have the goods ready for delivery, or so placed that they
can be unloaded with reasonable convenience; or because
of being wrongly informed by the carrier or its agent,
through mistake, on calling for goods, that they have
not arrived, although they have arrived and are stored
in the depot or warehouse; or by any similar conduct or
wrongful act on the part of the carrier. In some juris-
dictions the carrier is held not to continue liable as an
insurer by reason of such failure in the goods being de-
livered through misinformation or mistake on the part of
the carrier, but it is held liable as a warehouseman on the
ground that its negligence in failing to deliver the goods,
or causing them to be detained, is the proximate cause
of loss. But where by the terms of the contract of ship-
ment the liability is that of a warehouseman, negligence
must be shown to render the carrier liable. And where
the consignee has had sufficient time for the removal of
the goods after the discovery and correction of a mistake
as to their arrival, and notice thereof, the carrier is
not liable for loss on the ground of conversion.''

The case of *Arkansas Midland Rd. Co.* v. *Moody,*
90 Ark. 70, presented a case, the facts of which are similar
to the facts of this case, as appellant here asserts them
to be. There it was shown that cotton had been delivered
at the compress where Pendergrass, the plaintiff, stored
his cotton for his account. In a suit for the damages
sustained by this cotton, it was claimed by the railway
company that it had discharged its liability by delivering
the cotton to the compress company. The court there
said:

''If the compress company was the agent of Pender-
grass, the consignee, then, when the cotton was delivered
to it in 'good order', the duty of appellant was terminated,
and it was no longer liable to appellee. If, on the other
hand, the appellant has failed to show that the compress

company was the agent of Pendergrass, then it has not discharged its duty under the contract, and is liable for the damages resultant. The only question then is, does the uncontroverted evidence show that the compress company was the agent of Pendergrass?"

In the case of *Arkadelphia Milling Co.* v. *Smoker Merchandise Co.*, 100 Ark. 37, it was said: "The liability of the common carrier ceases with delivery of the goods at the point of destination according to the directions of the shipper, or according to the usage and custom of the trade at such place of destination. This delivery may be actual, or it may be constructive; and in either case the liability of the carrier terminates with such delivery. An actual delivery of goods is made when the possession is turned over to the consignee or his duly authorized agent and a reasonable time has been given him in which to remove the goods. When such delivery is thus made, the carrier is fully discharged from further liability. *Southern Exp. Co.* v. *Everett*, 37 Ga. 688; *Brunswick & W. Ry. Co.* v. *Rothchild*, 119 Ga. 604. To constitute constructive delivery, the carrier must give notice to the consignee or his duly authorized agent, if that is at all practicable, of the arrival of the goods, and must also give a reasonable opportunity and time thereafter for the consignee or his agent to remove same. When that is done, the liability of the carrier is terminated, whatever its liability may otherwise be."

See also, *Ark. Mid. Rd. Co.* v. *Premier Cotton Mills*, 109 Ark. 218. A number of cases on this subject are cited in the note to the case of *Hicks* v. *Wabash Railway Co.*, 8 L. R. A. (N. S.) 235.

Appellee insists with equal earnestness that it can not be held liable here, both because it had fully complied with its contract for the carriage of the goods, and because any control it may have retained over the cotton was for the purpose only of enforcing its claim for the freight due on the cotton. In support of this view, counsel cites and relies upon the case of *Arthur* v. *St. Paul & Duluth R. R. Co.*, 38 Minn. 95, 35 N. W. 718. It was there held that

the carrier was absolved from liability as such upon delivering goods to the warehouseman, notwithstanding the direction of the carrier to the warehoueman not to issue warehouse receipts until paid freight bills were presented. But in that case it was said: ''The custody of the property had completely passed from the carrier into that of the public warehouseman. All control over or right to it on the part of defendant had ceased except the right to resort to it to enforce collection of its freight charges in case plaintiffs, after demand, should refuse to pay them. Defendant's directions to the warehouseman that no warehouse receipts should be issued until the paid freight bills were presented imposed no condition upon their issue which is not imposed by clear implication by the statute itself, which provides for the issue of such receipts only upon application of the consignee, accompanied by proof that all transportation or other charges which may be a lien upon the grain, including charges for inspection and weighing, have been paid.'' Under the law of that State, warehouses are public warehouses, and the carrier discharged his contract of carriage when he delivered the commodity carried into the possession of one of them, and the conditions which the carrier there imposed were imposed by the law of that State, and did not affect the question of agency. The warehouseman received the goods under the law of that State for the consignee, and the carrier's direction imposed no condition not provided for by the statute, and the parties could not have contracted against the provisions of the law, while here the relation of the parties was fixed by their own acts.

Appellee insists that the contract between the railway company and the compress company, whereby that company agreed to assume responsibility and liability for loss or damage to cotton delivered to the compress company by the railway company, makes complete the delivery and absolves the railway company from liability here. But we do not agree with counsel in this contention. We express no opinion as to the effect of the contract between

the railway company and the compress company affecting liability for the loss of this cotton as between themselves, for we have no such question before us; but their agreement can not affect the rights of one not aware of nor a party to it.

We think no distinction can be made between the two shipments of cotton. If the compress company was the agent of appellant, then the delivery was complete in both cases, and there would be no liability in either case. If, however, the compress company was not the agent of appellant, and if the surrender of the bill of lading to appellee was essential to obtain the clearance upon which a warehouse receipt would be issued, then the right of recovery would be the same as to both shipments, for while there might have been no trouble in obtaining the clearance for the last shipment upon application therefor, still no opportunity had been afforded appellant so to apply. We conclude, therefore, that the court should not have directed a verdict in this case, but should have submitted the cause to the jury under instructions conforming to the views here expressed, and the judgment will therefore be reversed, and the cause remanded for a new trial.

McCULLOCH, C, J., (dissenting). The test in this case is correctly stated in the majority opinion to be whether or not the warehouse company was the agent of appellant, or of appellee, in holding custody of the cotton, and I think the undisputed evidence determines that test in appellee's favor. Appellant selected the place of delivery and gave general directions to appellee to deliver the cotton to the warehouse company, and the delivery was made in accordance with those instructions. The Peacock cotton was in possession of the warehouse company twelve days and the Mears cotton was in its hands two days before the cotton was destroyed by fire. The completed delivery in accordance with the directions of the consignee terminated the liability of the carrier. The fact that pursuant to a custom the warehouse company refrained from issuing warehouse receipts or from deliver-

ing the cotton to the owner until a clearance was given by the agent of the carrier did not change the effect of the custody of the warehouse company being that of the consignee and that the delivery was, therefore, complete. If such a custom can be considered in the case as having any bearing on the relation between the parties it is only for the protection of the carrier in the collection of freight charges. It may be conceded that the warehouse company was the agent of the carrier for the purpose of collecting the freight charges, but that does not affect the relation of principal and agent which subsisted between the warehouse company and the consignee. The same person may be the agent, for different purposes, of both parties to a contract. *Phoenix Ins. Co.* v. *State,* 76 Ark. 180; *Traveler's Fire Ins. Co.* v. *Globe Soap Co.,* 85 Ark. 169. The cotton was in the hands of the custodian selected by the consignee as its agent to hold and to care for it, and the effect of that relation was not destroyed by the other agency mentioned so as to continue the liability of the carrier.

The question of liability would be different if there was any proof that appellee had wrongfully refused a clearance and that appellant had failed to get possession of the cotton by reason of such wrongful act, but there is no such proof in this case. It is not shown either that the refusal to give a clearance was wrongful nor that appellant would have removed the cotton from the warehouse before the fire occurred. In other words, there is no charge of wrongful or negligent conduct on the part of the carrier, but liability is asserted solely on the ground that the relation of shipper and carrier subsisted at the time the fire occurred, and that the carrier was liable as an insurer of the cotton.

The Michigan and Minnesota cases cited by counsel for appellee are, I think, directly in point, and should control the decision in this case. *Black* v. *Ashley,* 44 N. W. 1120, 80 Mich. 90; *Arthur* v. *St. Paul & D. Ry.,* 35 N. W. 718, 38 Minn. 95. The fact that in the Minnesota case the delivery was to a public warehouse and that the stat-

ute gave a lien for freight charges does not distinguish it in principle from the present case, for the cases are similiar as to the controlling feature that warehouse receipts were withheld from the owner at the request of the carrier for the collection of freight charges. The court said: "It is true that it had been delivered to the warehouseman for the plaintiffs, subject to the instruction that a warehouse receipt should not be issued to them until evidence was presented that the transportation charges had been paid, and that, by reason of the freight bills not having been yet presented to them, they had not had an opportunity to obtain this written evidence of their title. But it does not seem to us that this fact at all affects or bears upon anything connected with the situation or custody of the property which goes to the considerations of public policy upon which the strict liability of the carrier rests. The custody of the property had completely passed from the carrier into that of the public warehouseman. All control over or right to it on part of defendant had ceased, except the right to resort to it to enforce collection of its freight charges, in case plaintiffs, after demand, should refuse to pay them."

My conclusion is that the delivery of the cotton to the warehouse according to directions of appellant ought to be treated in law as a complete delivery to the consignee so as to terminate the liability of the carrier.