CHARLES H. ARTHUR and others *vs.* ST. PAUL & DULUTH RAILROAD COMPANY.

December 28, 1887.

Common Carrier—Usage at Duluth as to Delivery of Wheat to Public Warehouseman—Termination of Carrier's Liability—Lien for Unpaid Freight.— The general custom of doing business in Duluth (known and acquiesced in by both parties) is for railroad companies to deliver grain for and in behalf of the consignee to any one of the public warehouses or elevators in that city immediately upon inspection by the public inspector. The amount of freight charges to which the railroad company is entitled is determined by the weight of the state weigh-master, who weighs it into the elevator. Upon the weight being reported to the elevator company by the weigh-master, the elevator company reports it to the railroad company and to the consignee. Thereupon the railroad company makes out its freight-bill, which is then presented to the consignee, and, upon its payment, gives him a receipt, and also gives the elevator company a statement that the freight-bill has been paid, whereupon, and not before, the elevator company issues a warehouse receipt to the consignee. In this case the grain, which had arrived over defendant's road consigned to plaintiffs at Duluth, was inspected in part on the

25th, and in part on the 26th of November, 1886, and weighed by the state weigh-master, and stored by defendant on November 26th in a public warehouse fit for such purposes, for and on behalf of plaintiffs, subject to a general instruction given by the railway companies to all the elevator companies not to issue any warehouse receipts until the paid freight-bills were presented. On the afternoon of November 27th, (Saturday,) between 4 and 5 o'clock, the elevator company gave plaintiffs written notice that the wheat had been placed to their credit, accompanied with a. report of the weight and grade. The defendant did not present its freight-bill to plaintiffs until November 29th, (Monday.) The wheat was accidentally destroyed by fire in the elevator on the night of November 27th, without any fault of either party. *Held,* that defendant's liability as carrier had terminated before the destruction of the property.

Same—Unpaid Freight—Warehouse Act.—*Also,* that the instruction not to issue warehouse receipts to consignees until the paid freight-bills were presented, imposed no condition or restriction upon their issue not imposed by the public-warehouse act, (Laws 1885, *c.* 144, § 6.)

Plaintiffs brought this action in the district court for St. Louis. county to recover the value of wheat alleged to have been destroyed while in the hands of the defendant as a common carrier. The answer alleged that the defendant had delivered the wheat before its destruction, and asked judgment for the unpaid freight. The action was submitted, upon an agreed statement of facts, to *Stearns, J.,* who ordered judgment for plaintiffs, from which the defendant appeals.

*Ensign, Cash & Williams,* for appellant.

*White, Shannon & Reynolds,* for respondents, cited *Derosia* v. *Winona & St. Peter R. Co.,* 18 Minn. 119, (133;) *Pinney* v. *First Div.,* etc., *R. Co.,* 19 Minn. 211, 251.

MITCHELL, J. In order to a full understanding of the facts, it is necessary first to refer to some of the provisions of chapter 144, Laws 1885, commonly known as the "Public-Warehouse Act." This act declares all elevators or warehouses in Duluth, in which grain is stored in bulk, and in which the grain of different owners is mixed, and doing business for compensation, to be public warehouses, and places them under the general supervision of the board of railroad and warehouse commissioners. The owner is required to obtain a license from this board, and give to the state bonds, with approved sureties, for the

faithful performance of his duties as a public warehouseman. He is required to receive for store any grain fit for storage that may be tendered him, without discrimination of persons.

The board appoints a chief inspector of grain, who, with their approval, may appoint deputies. These inspectors are required to take an oath of office, and to give bonds for the faithful discharge of their duties. All grain received in store must be first inspected by one of these inspectors, and his decision as to grade is final and binding on all parties in interest, subject to the right of appeal to the board. If, however, the owner is dissatisfied with the inspection, he may notify the carrier to withhold the grain from store in a public warehouse, and to deliver it to him elsewhere. The charges for inspection are to be paid by the warehouseman, and added to his charges for storage. The board also appoints a weigh-master and necessary assistants, who give bonds for the faithful discharge of their duties, and have supervision and exclusive control of the weighing of all grain, and their certificates of weight are conclusive upon all parties in interest. Scales for the weighing of grain are at all times subject to examination and test by a duly-authorized inspector or weigh-master. Upon application of the owner or consignee, accompanied with evidence that *all transportation and other charges which may be a lien on the grain, including charges for inspection and weighing, have been paid,* the warehouseman is required to issue him a warehouse receipt, stating, among other things, the amount and grade of the grain, and that it is deliverable upon the return of the receipt, properly indorsed by the person to whom it is issued. Any person owning or interested in any grain in any warehouse has a right at all times during business hours to examine all grain in the warehouse.

The agreed facts in the case are substantially these: About November 24, 1886, the defendant, as a common carrier, received from the Manitoba railroad at Hinckley three cars laden with wheat, shipped at Fergus Falls and consigned to the plaintiffs at Duluth. Two of the cars arrived at Duluth November 25th, and the third November 26th. Upon the arrival of the cars, the defendant recorded their numbers, and the names of the plaintiffs as consignees, in a book kept for the purpose in its public office in Duluth, and open to the in-

spection of all consignees, and usually resorted to by their private inspectors to learn of the arrival of cars. The seals of two of the cars were broken, and the wheat inspected and graded by the public inspector on November 25th, and the third in like manner on November 26th. The private inspector of plaintiffs, whose duty it was to watch for the arrival of cars consigned to them, and to see that the grain was properly inspected by the public inspector, knew of the arrival of these cars upon their arrivals respectively, and examined the grain after it had been inspected, and was satisfied with its grading, and plaintiffs made no request to defendant to withhold it from store in a public warehouse.

After such inspection the grain was weighed by the state weighmaster, and stored by defendant in one of the public warehouses in Duluth, suitable for such purposes, on the afternoon of November 26th, *"for and on behalf of plaintiffs,"* subject to the effect of the notice hereinafter set forth. On the afternoon of November 27th, between 4 and 5 o'clock, the warehouseman gave written notice to the plaintiffs that the wheat had been received by him, *and placed to their credit,* accompanied by a report giving the number of the cars, whence shipped, and the weight and grade of the grain. The wheat was accidentally destroyed by fire while thus in store, on the night of November 27th, without any fault of either party.

The notice above referred to, and which had been previously given by the defendant and other roads to all the elevators in Duluth, and under the directions of which they were all acting at this time, was as follows, (after reciting that some question had arisen as to the manner in which "wheat collections" were made at Duluth :) "Cars containing wheat received at Duluth and destined to the several elevators will be sent to such elevators as promptly as possible, and, as soon as weights are received, expense bills will be made out accordingly. We shall make no collections from the elevator companies; but it must be understood and agreed between the owners and operators of the several elevators in Duluth, *that warehouse receipts are not to be issued by them to the consignees or owners of the grain until our paid expense bills are presented;* and if they deliver any grain so held by them before the presentation of the expense bill, it is done on their

own responsibility, and in such cases, if any trouble as to collection arises, we shall insist upon the elevators paying the bills."

The amount of freight charges which the railroad company is entitled to is determined by the weight of the weigh-master, upon weighing the grain into the elevator. This had been so ever since the establishment of public warehouses under the act referred to. Upon the weight being reported to the elevator company by the weigh-master, the elevator company gives notice of the weight to the railroad company, and also to the consignee, and thereupon the railroad company makes out its freight-bill, which is presented to the consignee, and, upon its payment, the railroad gives him a receipt, and also gives the elevator company a statement that the freight-bill has been paid, whereupon, and not before, the elevator company issues a warehouse receipt to the consignee.

In this case the railroad company presented the freight-bill to the plaintiffs on November 29th, (the 28th was Sunday,) and plaintiffs refused to pay it. Neither the plaintiffs nor defendant had any warehouse in Duluth for the storage of grain, all the elevators there being public warehouses under the act of 1885. Neither had defendant any specific instructions from plaintiffs at what warehouse or elevator to deliver grain consigned to them, but the invariable custom had been, in the absence of particular instructions as to any particular consignment of grain, for the railroad companies to deliver grain to any one of the elevators that was most convenient to them, immediately upon the inspection by the state inspector. It is further agreed that "all the acts of all parties with reference to the wheat in question were in all respects in accordance with the uniform custom or usage in Duluth ever since the establishment of the public-warehouse system by said act of 1885, and *that said custom was well known to and acquiesced in by both parties hereto.*"

The sole question presented is whether, upon this state of facts, defendant's liability as common carrier had terminated before the loss of the grain on the night of November 27th. In order to intelligently and correctly determine this question, it is important to consider—*First,* the grounds upon which this stringent liability is made to rest, and then, *second,* whether these had, under the facts of this

case, ceased to exist, so that there was no longer any just occasion, within the reason of the rule, for holding the defendant to that liability. The reason of the rule, in the language of Best, C. J., in *Riley* v. *Horne*, 5 Bing. 217, is that, "when goods are delivered to a carrier, they are usually no longer under the eye of the owner; he seldom follows or sends any servant with them to their destination. If they should be lost or injured by the grossest negligence of the carrier or his servants, or stolen by them or by thieves in collusion with them, the owner would be unable to prove either of these causes of loss; his witnesses must be the carrier's servants, and they, knowing that they could not be contradicted, would excuse their masters and themselves." Chancellor Kent, expressing the same idea more tersely, says the rule is founded on broad principles of public policy and convenience, and was introduced to prevent the necessity of going into circumstances impossible to be unravelled.

A general answer to the question, when does this liability terminate? is obvious, viz.: Whenever the care and custody of the property has passed from the carrier to the owner, or some bailee of his own choosing, or whenever the owner has, after its arrival at its destination, had a reasonable opportunity of taking the property into his own charge. The crucial test is whether, having proper regard to the principles upon which the carrier's liability rests, the property has so far passed out of the care and custody of the carrier or his servants, into that of the owner, that there is no longer any occasion, within the reason of the rule, for further holding the carrier to this strict liability. So long as the reasons continue, the liability should also continue; when they cease, it should cease.

It is upon precisely this principle that this court, in common with the majority of the courts of the country, has held that, where goods, as usually handled after their arrival at their destination, are placed in the depot or warehouse of the carrier in the custody of its servants, the liability of the carrier, as such, continues until the consignee has had a reasonable time within which to take them away. The reason is manifest. In such case the owner has not yet got sight of them, or had any opportunity to examine them, in order to ascertain in what condition they arrived, nor to take them into his own custody.

In case of loss or injury, he would still be at the mercy of the statements of the carrier's servants as to when and how it occurred. He might not desire to leave his property in the hands of the carrier under the more limited liability of warehousemen, but might wish to take it into his own charge or place it in that of a custodian of his own choosing. But as he could not know when the goods would arrive, and hence could not be expected to be on hand the exact moment of their arrival, he could not do this until he had a reasonable opportunity to come and examine them, and take them away. If, after such opportunity, he still left them with the carrier, he would be deemed to have assented that it might hold them under the more limited liability of warehousemen. Under the state of facts referred to, the same reasons of public policy upon which the carrier's liability rests during actual transportation are equally applicable, and hence the liability continues. And it is upon these grounds that what is called the "New Hampshire Rule" rests, which is invoked with so much confidence in this case by the plaintiffs. *Moses* v. *Boston & Maine R. Co.*, 32 N. H. 523.

But the facts are not all analogous to the case supposed. A new method of doing business in the matter of handling bulk grain has arisen under this public-warehouse system and the business usages of Duluth. It is one of the great excellences of the common law that it does not consist of inflexible statutory rules adapted to particular circumstances, which might become obsolete, but of certain comprehensive principles, founded on reason and natural justice, and adapted to the circumstances of all cases which fall within them. When new modes of doing business and new combinations of facts arise, these same principles will apply; but they must be adapted to the new situation by considerations of fitness and reason which grow out of these circumstances.

The consideration of the facts of this case, in the light of what has been said, logically and necessarily leads, as we think, to the conclusion that defendant's liability as carrier had terminated before this grain was destroyed. The condition of the property upon its arrival had been conclusively determined by the inspection and weight of the officers of the state, whose decisions were final as to

both parties, and to the correctness of which, as to grade at least, plaintiffs had assented. The grain had gone out of the custody of the carrier's servants into that of a public warehouseman, to whom plaintiffs had authorized defendant to deliver it; for, under the custom of doing business, the case stands precisely as if they had expressly designated this particular elevator. The delivery of the grain, as a physical act, was completed. The carrier had done the last act with reference to the property itself which his duty required. It had been stored in the elevator "for and in behalf of the plaintiffs," and they had been notified by the warehouseman that he had placed it to their credit.

It is true that it had been delivered to the warehouseman for the plaintiffs, subject to the instruction that a warehouse receipt should not be issued to them until evidence was presented that the transportation charges had been paid, and that, by reason of the freight-bills not having been yet presented to them, they had not had an opportunity to obtain this written evidence of their title. But it does not seem to us that this fact at all affects or bears upon anything connected with the situation or custody of the property which goes to the considerations of public policy upon which the strict liability of the carrier rests. The custody of the property had completely passed from the carrier into that of the public warehouseman. All control over or right to it on part of defendant had ceased, except the right to resort to it to enforce collection of its freight charges, in case plaintiffs, after demand, should refuse to pay them. Defendant's instructions to the warehouseman, that no warehouse receipts should be issued until the paid freight-bills were presented, imposed no condition upon their issue which is not imposed by clear implication by the statute itself, which provides for the issue of such receipts only upon application of the consignee, accompanied by proof that all *transportation* or other charges which may be a lien upon the grain, including charges for inspection and weighing, have been paid. This clearly contemplates that the carrier may make delivery of grain for the consignee with the freight charges following it as a lien, which must be paid before a warehouse receipt shall be issued. In fact, business could not be well done in any other way, unless the carrier

is to surrender all lien for his freight, because the amount of these transportation charges can only be determined after the grain is weighed into the elevator.

The policy of the law is that all legitimate charges connected with the transportation and handling of the property should follow it into the public warehouse, and be paid before a warehouse receipt, transferable in the market, shall be issued. The inspector's and weighmaster's fees thus follow the property, and why not the carrier's? It is true, the statute provides that the inspector's fees shall be paid by the warehouseman, and added to his charges for storage; but, so far as the weigh-master's fees are concerned, we do not see why they do not stand on the same footing as charges for transportation. Subject to this claim for freight, this property had passed from the custody of the carrier into that of the warehouseman, as bailee of the plaintiffs. Every conceivable consideration of public policy upon which a carrier's liability is founded had ceased, and hence, upon every principle of reason and justice, the liability itself must be held to have also ceased.

Judgment reversed, and cause remanded, with directions to the court below, upon the agreed facts, to render judgment for defendant.