## WICHITA FALLS & N. W. R. CO. v. J. J. BROWN CO.

No. 9327—Opinion Filed May 27, 1919.

Rehearing Denied Sept. 30, 1919.

(Syllabus by the Court.)

1. Carriers—Delivery of Freight.

Under section 821, Rev. Laws of 1910, in order for a railway company to absolve itself from liability as an insurer of goods transported by it, it must deliver the property to the consignee at the place to which it is addressed, in the manner usual at that place.

2. Same—Delivery of Cotton to Compress—Effect.

In an action for cotton destroyed by fire after delivery to an independent compress company, with which consignee had made arrangements to receive the goods from the railway company, where it is shown that the customary way of making delivery was for the railway company to unload the cotton at the compress, to receive from the compress company cotton tickets identifying each bale by weight, number, etc., and to take said tickets to plaintiff's agent, who, upon surrender of the tickets, would pay the freight charges and surrender the bill of lading for said cotton to the railway company, and where it is shown that the consignments of cotton in controversy were promptly unloaded by the railway company, the compress tickets delivered to the railway company on the same day, and plaintiff's agent had been advised by the railway company that the cotton had been unloaded and that the company had the tickets, and upon his request the agent of the railway company promised to bring the tickets to the bank and turn them over to plaintiff's agent, but neglected to do so, held, since the railway company retained the tickets for its own convenience and benefit, and since the plaintiff could not secure the cotton, as a matter of right, without the tickets which represented the actual cotton, the railway company had not made delivery of the cotton in the manner usual at that place, and delivery not having been completed at the time of the fire, the relation of carrier and shipper still existed, and the railway company was liable to the plaintiff, as insurer, for the loss of said cotton.

Harrison, J., dissenting.

Error from District Court, Cotton County: Cham Jones, Judge.

Action by the J. J. Brown Company against the Wichita Falls & Northwestern Railway Company. Judgment for plaintiff, and defendant brings error. Affirmed.

C. C. Huff, Robinson & Whiteside, Mounts & Davis, and Locke & Locke, for plaintiff in error.

John M. Young and Johnson & Stevens, for defendant in error.

RAINEY, J. The J. J. Brown Company, as plaintiff, recovered judgment in the district court of Cotton county, Okla., against the Wichita Falls & Northwestern Railway Company, in the sum of $14,742.73, to reverse which the railway company has commenced this proceeding in error. For convenience, the parties to the action will be designated plaintiff and defendant, respectively, as they appeared in the trial court.

The material facts of the case as developed at the trial are substantially as follows:

The plaintiff company, at the time of the transactions hereinafter mentioned, was engaged in buying, selling, and shipping cotton, and had its principal place of business at Lawton, Okla. Through its agents it frequently purchased cotton in small towns in lots from ginners, merchants, and others, and on November 5, 1915, it bought 242 bales of cotton from the Simmons Gin Company, said cotton consisting of three lots; 27 bales were transported over the defendant company's line of railway from Loveland, 115 bales from Hollister, and 100 bales from Grandfield, all of said stations being in Oklahoma; and all of said cotton was consigned to Altus, Okla. The seller delivered the cotton to the railway company for shipment to Altus, and received from said company a shipper's order bill of lading with a notation thereon "Notify J. J. Brown Company." This bill of lading was indorsed by the Simmons Gin Company to the plaintiff and was sent to the First National Bank of Altus, Okla., with draft attached for the purchase price of said cotton; the plaintiff having made arrangements with said bank to handle its account. The plaintiff had theretofore given general directions to the railway company to deliver all cotton consigned to it to the Interstate Compress Company at Altus, which was the only compress at said place, and where it was concentrated, weighed, and sampled preparatory to reshipment, according to a custom which had been in existence for several seasons.

The undisputed evidence is that this customary way of handling cotton shipments at Altus was as follows: Immediately upon the arrival of the cotton the railway company would make out its expense bills and from these unloading slips would be made to the compress. The car of cotton would thereupon be placed at the compress by the railway company for unloading; the railway company's cotton clerk would present the unloading slips to the compress company for signature;

the compress company would then issue compress tickets identifying each bale by weight, number, etc., which it would hand to the cotton clerk for transmission to the local office of the railway company. These tickets would be turned over to Mr. T. D. Utt, cashier of the defendant railway company at Altus. The compress tickets would then be placed with the expense bills and would be ready for delivery upon surrender of the original bill of lading and the payment of the freight charges. According to arrangements previously made, the bills of lading would be at the First National Bank as plaintiff's agent; said bank being authorized by plaintiff to deliver the same and pay the freight charges. The railway company's cashier, soon after receiving the cotton tickets from the compress company, would take them to the bank, where the cotton tickets would be counted, and if they corresponded with the number of bales on the bill of lading the bank would surrender the bill of lading and pay the freight charges upon receipt of said tickets. On several occasions the compress tickets would not be ready for the cotton at the time it was unloaded, and sometimes the party handling the cotton for the railway company, on account of other duties to perform, would not wait at the compress for the tickets, but the compress would notify the party as soon as they were made out and then some employe of the railroad company would go to the compress for the tickets. Sometimes on account of the heavy volume of business this person would delay going to the compress for the tickets. The compress tickets were usually taken to the bank on the day the cotton arrived, but on a few occasions they were not delivered to the company's local agent until after his customary time of going to the bank, which was shortly before 4 o'clock of each day; from 4 p. m. to 6 p. m. he was busy selling tickets for two trains which kept him at the ticket window practically all the time until after 6 o'clock p. m. If Mr. Henry, the cashier, was at the bank after this time the agent would take the tickets to him then, but frequently he was not at the bank after 6 p. m. and the tickets would not be delivered to him until the following day.

It was customary for the compress company, after receipt of the cotton stored with it, to sample and weigh and re-mark the same; and the samples and weight sheets were immediately transmitted to the plaintiff at Lawton. The compress company would not deliver the cotton to the plaintiff nor to its order, except upon surrender of the compress tickets, but would deliver the cotton to

any one in possession of the tickets after the freight and other charges had been paid. In the instant case the draft drawn by the Simmons Gin Company on the plaintiff for the 242 bales of cotton was paid by the First National Bank of Altus for the plaintiff on November 13, 1915. Of the three consignments of cotton, the one shipped from Grandfield and the one shipped from Hollister reached Altus about 5 p. m., November 12, 1915, and immediately upon arrival were delivered by the railway company to the Interstate Compress Company, and the compress receipts and tickets were delivered by the compress company to the railway company on the same day. The consignment from Loveland reached Altus on November 15, 1915, and was delivered by the railway company to the compress company about 11 o'clock a. m., and the compress receipts and tickets were delivered by the compress company to the railway company at the time the cotton was unloaded. The compress company immediately tagged, weighed, and sampled each bale in the three consignments and transmitted the samples and weight sheets to the plaintiff at Lawton, 200 of which were received by the plaintiff on November 14th, and the remainder on November 16th.

On the same day the plaintiff purchased the cotton from the Simmons Gin Company it contracted to sell 500 bales of cotton to the Japan Cotton Trading Company, of Ft. Worth, Tex., and agreed to deliver as a part of said contract the identical 242 bales herein involved. This transaction was carried on through oral negotiations between Mr. Brown and one Hardin, as agent for the Japan Cotton Trading Company, and the contract was confirmed a few days later in writing by both principals. On November 15th, the plaintiff and the agent for the Japan Cotton Trading Company examined the samples and weight sheets received from the compress company and agreed upon the grades of the cotton, invoices describing each bale were made out, and the invoices and samples were delivered by the plaintiff to the agent of the Japan Cotton Trading Company; the samples being sent by express to said company's office at Ft. Worth, Tex. The purchaser issued two drafts to the plaintiff in payment of said cotton; it being agreed and the drafts specifying that the compress tickets should be attached to the drafts. The plaintiff forwarded these drafts to the First National Bank of Altus, Okla., with instructions to the bank to surrender the bills of lading to the railway company, pay the freight charges, secure the compress tickets from the railway company, attach same to the drafts given plaintiff by the Japan Cotton Trading Company, and to forward the same to Ft. Worth, Tex., to be presented to said company for payment. On November 16, 1915, upon receipt of these drafts, Mr. Henry, cashier of the bank, called Mr. Utt, the cashier of the defendant railway company at Altus, over the telephone, and upon inquiry was advised by him that the railway company had delivered the cotton to the compress company on November 12th and 15th, respectively, and had the compress tickets. Mr. Henry then requested said cashier to bring the tickets to the bank and notified him that the bank was ready to surrender the bills of lading and to pay the freight charges for the plaintiff. Mr. Utt promised to do this, but he had neglected so to do up to 7 o'clock of the evening of that day, at which time the Interstate Compress Company was destroyed by fire; the fire consuming a large quantity of cotton, including the 242 bales herein involved. On the morning next after the fire the plaintiff and Mr. Hardin, as agent for the Japan Cotton Trading Company, classified the remaining 42 bales of cotton. On the 18th, following, J. J. Brown, the manager of the plaintiff company, went to Altus and, upon ascertaining that the bank had not received the compress tickets for the 200 bales of cotton and had not surrendered the bills of lading and paid the freight charges, went to the defendant company's local agent, a Mr. Post, tendered said bills of lading and payment of the freight charges, and demanded the compress receipts and tickets, whereupon said agent refused to surrender the same, assigning as his reason therefor that he had already made his report of the loss to the insurance company with which the railway company carried insurance, and had also received instructions from Mr. C. L. Fontaine, the defendant company's general freight agent, not to deliver any more compress tickets. Mr. Brown at once called Mr. Fontaine over long distance telephone at Wichita Falls, Tex., and offered to pay the freight charges, surrender the bills of lading, and to release the company from liability if it would surrender the compress tickets, explaining that it was necessary to have the cotton tickets in order to make delivery and to receive payment from the Japan Cotton Trading Company. Mr. Fontaine declined to surrender the tickets and advised Mr. Brown that the defendant company had reported the cotton consumed by the fire to the defendant's insurance company as the defendant company's loss, and stated that he was afraid the surrender of the tickets would complicate the situation and might jeopardize the defendant company's entire claim against the insurance

company (the claim included a large quantity of cotton consumed in the same fire), but that the railway company would push the claim to a prompt settlement with the insurance company. In the same conversation Mr. Fontaine promised to pay plaintiff for the cotton within a short time—not more than two or three weeks—at the same time assuring Mr. Brown that the defendant's money was as good as the Japan Cotton Trading Company's money. For some time thereafter the defendant continued to treat the loss as its own and endeavored to secure a settlement with the insurance company. The evidence further shows that thereafter the Japan Cotton Trading Company undertook, without success, to collect the value of said cotton from its insurance company, and later filed a claim with the defendant railway company for the value of said cotton, which claim was rejected on the ground that the shipment had been completed and delivery made to the plaintiff prior to the fire. and that therefore the defendant company's liability as a common carrier had ceased. The railway company finally denied liability, whereupon plaintiff instituted this action.

We are confronted, first, with the proposition whether under the foregoing state of facts the railway company is liable as an absolute insurer of the cotton. In this state the liability of a common carrier for loss of freight that it undertakes to transport for a shipper is governed by sections 815, 820, 821, 822, 823, and 824, Rev. Laws 1910, which read as follows:

"815. Unless the consignor accompanies the freight and retains exclusive control thereof, a common carrier of property is liable, from the time he accepts until he relieves himself from liablity as hereinfter provided, for the loss or injury thereof from any cause whatever, except: First, an inherent defect, vice or weakness, or a spontaneous action of the property itself; second, the act of a public enemy of the United States, or of this state; third, the act of the law; or, fourth, any irresistible superhuman cause."

"820. When the directions of a consignor and consignee are conflicting, the carrier must comply with those of the consignor in respect to all matters except the delivery of the freight, as to which he must comply with the directions of the consignee, unless the consignor has specially forbidden the carrier to receive orders from the consignee, inconsistent with his own.

"821. A carrier of property must deliver it to the consignee at the place to which it is addressed in the manner usual at that place.

"822. If there is no usage to the contrary at the place of delivery, freight must be delivered as follows: First. If carried upon a railway owned and managed by the carrier, it may be delivered at the station nearest the place to which it is addressed. Second. In other cases, it must be delivered to the consignee or his agent personally, if either can, with reasonable diligence, be found.

"823. If, for any reason, a carrier does not deliver freight to the consignee or his agent, personally, he must give notice to the consignee of its arrival, and keep the same in safety, upon his responsibility as a warehouseman, until the consignee has had a reasonable time to remove it. If the place of residence or business of the consignee be unknown to the carrier, he may give the notice by letter dropped in the nearest post office.

"824. If a consignee does not accept and remove freight within a reasonable time after the carrier has fulfilled his obligation to deliver, or duly offered to fulfill the same, the carrier may exonerate himself from further liability by placing the freight in a suitable warehouse, on storage, on account of the consignee, and giving notice thereof to him."

It is admitted that the fire which consumed the cotton in controversy was not in any way attributable to the negligence of the railway company, so whether the defendant is liable as an insurer for the loss of the cotton depends upon whether it had made delivery to the plaintiff; and since the undisputed evidence shows that there was a well-established custom at Altus known to and practiced by the parties relative to the delivery of consignments of cotton, we must determine whether delivery was made by the carrier to the consignee at Altus "in the manner usual at that place." According to the evidence, the Interstate Compress Company performed certain services for the plaintiff with reference to weighing, sampling, and marking the cotton, for which the plaintiff paid it a fixed compensation of 15 cents per bale, and said compress company was therefore plaintiff's agent in performing such services. The plaintiff had also given instructions to the railway company to deliver the cotton to the compress company and this would constitute the compress company plaintiff's agent for the purpose of receiving the cotton. The compress company, however, was an independent concern and performed different services for various parties. For convenience in reshipping, when desired by the owner, the railway company would have the cotton compressed and would pay the compression charges, but would add this expense to the outgoing freight bills. It is also conceded that the railway company had made delivery of the actual physical cotton to the compress company, but it had not delivered the compress tickets to plaintiff, or plaintiff's agent, the First National Bank. The precise question for determination, then, is: Was delivery complete while the railway company

still retained the cotton tickets, or was the delivery of said tickets requisite in order to complete delivery?

There are many cases cited in the brief filed by the defendant to the effect that a carrier absolves itself from liability when it makes physical delivery of freightage, and, although we have read these cases and carefully considered the facts of each case and the application made of the principles of law therein announced, we do not deem it necessary to fully distinguish the cases so cited from the case at bar. The conclusion we have reached, both upon principle and authority, is that the mere physical transfer of the cotton from the railway company to the compress company did not constitute such completed delivery as would relieve the railway from its stringent liability as an insurer. One of the important circumstances we have taken into consideration is that the railway company in unloading the cotton at the compress did not divest itself of all power and dominion over it, and the possession thereof, together with the right of control, did not immediately pass to the consignee. With reference to the delivery of personal property. it has been generally held that to constitute a good delivery, whether actual or constructive, the seller must divest himself of all power and dominion over the property sold, and in order to do this it is necessary for him to part with possession of it and to surrender all right and authority to control it; and it has been held that the "mere discharge" of a cargo of goods is not delivery, and unless there is a valid substituted delivery the liability of the carrier does not terminate until actual delivery. The St. Georg (D. C.) 95 Fed. 172.

Now, in the instant case, the railway company retained the cotton tickets, which, according to the evidence in the case, represented the cotton itself, and until the plaintiff, or his agent, secured possession of the tickets it could not complete a sale or clear the cotton, but could exercise only a limited dominion over it through the compress company, which was only plaintiff's agent for specified purposes.

Section 821, supra, of our Rev. Laws, does not provide that physical delivery alone is sufficient, but that delivery must be made in the manner usual at the place of delivery. According to the custom proved at the trial the compress tickets should have been promptly delivered to the First National Bank as plaintiff's agent, but the railway company retained the tickets for its own convenience and benefit; and it being its duty to deliver the cotton in the usual or customary manner, it cannot be said that delivery was complete until it had fully complied with such custom or usage. Nor is it a sufficient answer to say that the defendant had delivered the cotton to the compress company as directed by the plaintiff, for, although it is true that the plaintiff had so directed, at the same time it clearly appears from all the evidence in the case that these directions were given in connection with plaintiff's other directions to the railway company to deliver the tickets to the bank, which should have been done promptly upon delivery of the cotton, so that no considerable period of time should have intervened between said acts. This was not only the long-established custom adopted and acquiesced in by the parties, but was the practical construction placed upon the contract between the carrier and consignee.

We think the principle announced by Moore on Carriers (2d Ed.) p. 395, is applicable to the facts of this case. We quote therefrom as follows:

"Where goods, after arrival at their destination, have been applied for or demanded, but are refused or detained by the carrier, except where the goods are properly held for freight charges due, the carrier's liability as an insurer of the goods may be extended beyond what would ordinarily be a reasonable time and be continued until a reasonable time after the goods have been offered for delivery to the consignee. The carrier's liability as a common carrier continues without regard to the time the goods may have actually been ready for delivery, where the consignee is prevented, without fault on his own part, from removing and caring for his goods by reason of the failure of the carrier to have the goods ready for delivery, or so placed that they can be unloaded with reasonable convenience; or because of being wrongfully informed by the carrier or its agent, through mistake, on calling for the goods, that they have not arrived, although they have arrived and are stored in the depot or warehouse; or by any similar conduct or wrongful act on the part of the carrier."

Supporting the conclusion we have reached is the case of Southern Grocery Co. v. Bush, 131 Ark. 153, 198 S. W. 136, which is very similar to the case before us. That case involved two consignments of cotton which were delivered on November 16 and 26, 1915, respectively, by the railway company at Pine Bluff, Ark., to the Pine Bluff Compress & Warehouse Company, and were destroyed by fire on November 28, 1915, without any negligence on the part of the defendant company in the destruction of the cotton. One of the shipments had been in the warehouse 12 days, of which the plaintiff had received actual notice. The other shipment was received on Saturday before it was destroyed

in the afternoon of the following day, and plaintiff had received no notice of its arrival. Both shipments had been actually delivered to the compress company pursuant to general directions from the plaintiff. In that case, like the one at bar, it was agreed that the compress company was engaged in receiving and storing cotton for its customers, on terms agreed on between them, and it was likewise the practice of the compress company to weigh, sample, and mark the cotton, and to transmit the samples immediately to the consignee, which samples were used by the consignee in selling the cotton. It had been the practice for many years for the railway company to issue clearances for consignments of cotton which it had delivered to the compress company. These clearances were equivalent to, and substantially stood in the same relation to the actual cotton as, the tickets in the instant case. It was customary, after the cotton had been checked up and it had been ascertained that the freight had been paid, for the railway company to promptly issue clearances and to deliver the same to the agent of the compress company, whereupon the compress company would issue warehouse receipts to the consignee showing that it held the bales specified for consignee's account. It was also shown in that case that it was the custom of the consignee to send its representative to the office of the freight agent of the railway company to check up with that officer the cotton which had been received in Pine Bluff for consignee, and for this agent of the consignee to pay the freight charges thereon. This agent, upon being advised of the arrival of one of the shipments of cotton, applied daily thereafter at the office of the railway company for the clearances for the cotton until the Saturday before it was destroyed by fire, and tendered the railway company's freight agent the freight charges due upon the consignment. It was also in evidence in that case that the freight agent knew that the plaintiff's agent desired the clearances in order to obtain warehouse receipts from the compress company, and that under the rules of the railway company, which were well known to the parties, it was essential to have the clearances in order to obtain the warehouse receipts from the compress company. The railway company at all times refused to issue the clearances on account of a discrepancy in the markings of one of the bales, which resulted in the plaintiff being unable to obtain the warehouse receipts. With reference to the case the Supreme Court of Arkansas said:

"It is true that the cotton had been stored where appellant desired it to be stored, and that samples thereof had been furnished appellant. But it is fairly inferable from this testimony that this was tentatively done upon the assumption that appellant would, pursuant to its usual practice, obtain the necessary clearance from the railway company. We think it is not of controlling importance in this case that the cotton was, in fact, stored where the appellant would have stored it if no controversy had arisen over the clearance and no difficulty had been encountered in obtaining the warehouse receipt. We think the test is whether the consignee could have removed the cotton had it desired to do so. In other words, was the clearance essential for the actual delivery of the cotton to appellant? Would the compress company have made such a delivery without the production of the clearance as a matter of right, and not as a mere matter of accommodation upon the assumption that the consignee was entirely solvent and responsible and would hold the compress company harmless from any damage resulting from the failure of the compress company to comply with the railway company's requirement? * * *

"Witnesses for appellant who are large handlers of cotton at Pine Bluff testified that the custom of the railway company to require the clearance from it was adopted by the railway company for its own protection and to insure the payment of its freight charges, and that, so far as their experience went, warehouse receipts from the compress company could not be obtained without the exhibition to the compress company of the clearance. We think, therefore, that the jury might have found that, for its own purposes and protection, the railway had adopted a rule, the enforcement of which by its agent rendered the compress company the agent of the railway company until the rule or custom of the railway company had been complied with. It will be borne in mind that the railway company was not withholding its clearance for the purpose of collecting its freight charges, for a tender had been repeatedly made of these charges, but that the basis of its refusal was that the number on one of the bales of cotton did not correspond with the number on the bill of lading. * * *

"Appellee insists with equal earnestness that it cannot be held liable here, both because it had fully complied with its contract for the carriage of the goods, and because any control it may have retained over the cotton was for the purpose only of enforcing its claim for the freight due on the cotton. In support of this view, counsel cites and relies upon the case of Arthur v. St. Paul & Duluth R. R. Co., 38 Minn. 95, 35 N. W. 718. It was there held that the carrier was absolved from liability as such upon delivering goods to the warehouseman, notwithstanding the direction of the carrier to the warehouseman not to issue warehouse receipts until paid freight bills were presented. But in that case it was said: 'The custody of the property had completely passed from the car-

rier into that of the public warehouseman. All control over or right to it on the part of defendant had ceased, except the right to resort to it to enforce collection of its freight charges in case plaintiffs, after demand, should refuse to pay them. Defendant's directions to the warehouseman that no warehouse receipts should be issued until the paid freight bills were presented imposed no condition upon their issue which is not imposed by clear implication by the statute itself, which provides for the issue of such receipts only upon application of the consignee accompanied by proof that all transportation or other charges which may be a lien upon the grain, including charges for inspection and weighing, have been paid."

"Under the law of that state, warehouses are public warehouses, and the carrier discharged his contract of carriage when he delivered the commodity carried into the possession of one of them, and the conditions which the carrier there imposed were imposed by the law of that state, and did not affect the question of agency. The warehouseman received the goods under the law of that state for the consignee, and the carrier's direction imposed no condition not provided for by the statute, and the parties could not have contracted against the provisions of the law; while here the relation of the parties was fixed by their own acts."

The principal case relied upon by the railway company to support its contention that it had made delivery of the freight is the case of Arthur v. St. Paul & Duluth R. R. Co., 38 Minn. 95, 35 N. W. 718, alluded to by the Supreme Court of Arkansas in the above excerpt and distinguished in it from the case that court then had under consideration. The instant case is likewise distinguishable from the Minnesota case, and we are of the opinion that the Arkansas case is based upon sound principle and is in accord with right and justice. Even Mr. Chief Justice McCulloch, who was of the opinion that the Minnesota case was directly in point and should be followed, in his dissenting opinion in the Arkansas case said:

"The question of liability would be different if there was any proof that appellee had wrongfully refused a clearance and that appellant had failed to get possession of the cotton by reason of such wrongful act, but there is no such proof in this case. It is not shown either that the refusal to give a clearance was wrongful or that appellant would have removed the cotton from the warehouse before the fire occurred."

And it seems to have been his opinion that if there had been any wrongful or negligent act on the part of the carrier and liability asserted on that ground, plaintiff should have recovered. However, we do not base our conclusion on the ground of liability for wrongful or negligent conduct, but hold,

for the reasons above stated, that the relationship of carrier and shipper continued until the freight was delivered according to the usual custom at Altus, and that said delivery was not complete, under the facts of this case, until the cotton tickets were delivered to the plaintiff, or plaintiff's agent.

The facts being practically undisputed, the conclusion we have reached makes it unnecessary to consider the remaining assignments of error.

The judgment is therefore affirmed.

OWEN, C. J., and KANE, PITCHFORD, McNEILL, and HIGGINS, JJ., concur.

HARRISON, J., dissents.

JOHNSON, J., not participating.