**HOUSTON & T. C. RY. CO. v. J. W. GEER & SONS. (No. 8605.)**

(Court of Civil Appeals of Texas. Dallas. Dec. 17, 1921. Rehearing Denied Jan. 14, 1922.)

**1. Carriers ⬅114—Cotton on platform of compress company held not to have been delivered when burned.**

Where a carrier had no warehouse, but used compress company's premises for storage of cotton at a certain point, and where it burned after it was unloaded on the compress company's platform, and had been weighed and samples therefrom drawn pursuant to custom, and before consignee could obtain possession, because instruments required of the compress company by the carrier precedent to delivery to the owner, pursuant to custom, had not been delivered, the carrier was liable for its loss as a carrier under Rev. St. art. 712, since the cotton had not been delivered; the compress company under the circumstances being the agent of carrier, and not the agent of consignee.

**2. Carriers ⬅140—Carrier's liability where in possession more than reasonable time after notice to consignee, etc., held that of a warehouseman.**

If goods are destroyed in a carrier's possession more than a reasonable time after notice to consignee of arrival of shipment, and after consignee failed to pay freight and receive the tickets entitling owner to possession, its liability is that of a warehouseman.

Appeal from Grayson County Court; Dayton B. Steed, Judge.

Action by J. W. Geer & Sons against the Houston & Texas Central Railway Company. Judgment for plaintiffs, and defendant appeals. Affirmed.

Baker, Botts, Parker & Garwood, of Houston, Head, Dillard, Smith, Mardy & Head and B. F. Holt, all of Sherman, for appellant.

McReynolds & Hay, of Sherman, for appellees.

HAMILTON, J. This is an appeal from a judgment recovered for the destruction by fire of a shipment of 13 bales of cotton.

The appellees, plaintiffs below, alleged that the shipment was made from Anna to McKinney by E. E. Cox, who, for a valuable consideration, transferred the bill of lading to appellees, the cotton having been consigned to the order of said E. E. Cox at destination, notify J. W. Geer & Sons; that the bill of lading under which the shipment moved over the defendant's line of railroad contained a recitation "for concentration," by which expression it was meant that the cotton was to be compressed at the McKinney Compress Company located at McKinney, Tex.; that the usage and custom with reference to delivery of cotton by appellant to the McKinney Compress Company for compressing which had prevailed and had been recognized by appellant for a long period of time, and which prevailed and was acted upon by appellant with reference to this particular shipment, was as follows: Upon arrival of shipment of cotton at McKinney which was intended to be delivered to the compress company for compressing, or prior to the arrival thereof, it was the duty of the railroad company to notify the compress company of the arrival, or expected arrival, of such shipment in advance of the actual delivery thereof to the compress company. This notice was given by delivery to the compress company by the railroad company of a "receiving slip." It showed the name of the shipper, the date, origin, and destination of the shipment, the number of the bill of lading and waybill under which the shipment moved, the number of bales, weight, and marks thereon, and the number and initial of the car in which the shipment was carried. The notice was made in duplicate; one copy was delivered to the compress company and the other retained by the agent of the railroad company, which was signed by the manager of the compress company "subject to joint inspection and count."

By this custom and usage, it was alleged, such notice of the intended delivery of cotton was delivered in advance of the actual delivery of the cotton in order to give the compress company notice, to the end that it might be prepared to handle the cotton when it arrived. It was further alleged to be a prevailing usage and custom recognized both by the railroad company and the compress company, that upon the arrival and unloading of such shipment of cotton on the platform of the compress company the latter would check the cotton, counting and identifying the bales, whereupon each bale would be weighed and tagged by the compress company, which would then make out and deliver to the railroad company a receipt for the cotton, each receipt being numbered, showing the weight of the cotton, etc., and signed by the manager of the compress company; that the receipts so issued by the compress company were held by the railroad company for delivery to the owner of the compress company upon surrender of the original bill of lading covering the shipment, and that, according to this custom and usage so recognized and acted upon, delivery of cotton to the compress company was not effected until the cotton in question actually had been unloaded on the compress platform, checked, weighed, and the receipt of the compress company had been issued therefor.

It was alleged that, pursuing this custom and usage the railroad company, on the 18th day of March, 1916, made out in duplicate notices designated as "receiving slips" cover-

ing the 13 bales of cotton described in the bill of lading, one copy of which notice was signed by the agent of the railroad company and delivered to the McKinney Compress Company on the 20th day of March, 1916, and another copy was signed by the manager of the compress company "subject to joint inspection and count," and retained by the agent of the railroad company, at which time the cotton was in possession of the railroad company, loaded on its cars, either in transit or at the yards in McKinney, and was on the 21st day of March, 1916, unloaded and placed on the platform of the McKinney Compress Company, where, in a very short time thereafter, it was destroyed by fire, before receipts had been issued by the compress company in conformity with the usage and custom alleged to prevail as above stated.

Appellant demurred to the petition and answered by general denial. It specially answered to the following effect: That appellees were cotton buyers, operating in and around McKinney, Tex.; that they had no place to store cotton at McKinney while it was awaiting shipment, and used the facilities of the compress company for this purpose; that the word "concentration" in the bill of lading meant that cotton would be shipped to the compress company by appellees until sufficient had arrived for sale and shipment, and that the term "concentration" meant that the cotton was being shipped to McKinney by appellees for yarding and other purposes, incident to awaiting sale and shipment, and that in receiving, weighing, sampling, marking cotton, and performing other services, as well as unloading cotton, the compress company acted as the agent of appellees instead of appellant. It was further alleged that a contract existed between appellees and the compress company whereby the risk of all fire damage was assumed by appellees; that the cotton was shipped by appellant in accordance with such understanding; that it was the duty of appellees to unload it upon arrival, and that this service was performed by the compress company for them; that the cotton was delivered to the compress company for, and as the agent of, appellees, and accepted by the compress company for them; that it had been weighed, tagged, and sampled for appellees; that the samples had been delivered to appellees, and they were attempting to sell the cotton and exercising their rights of ownership of it at the time it was destroyed by fire, and that at the time of its destruction it was being held for them subject to all risks of fire in order to enable them to sell it, and, while they were actually trying to sell it.

Other portions of the answer are omitted, for the reason that we deem them immaterial to a full understanding of the single question presented by the case.

We think the record reflects the undisputed facts to be that the rule and custom alleged by appellees existed at McKinney at the time of the shipment and of the fire, and that this particular delivery was made with reference to such custom and in pursuance of it. It appears from the evidence that J. W. Geer had notice on the morning of March 21st that the cotton had arrived at McKinney, and that he telephoned the compress company and thereby obtained samples of the bales of cotton, which were delivered to him at an interurban car on which he went to Dallas for the purpose of making sale of the cotton on that date. A few hours after the samples had been obtained and delivered to him, the compress burned, destroying 10 bales of the cotton, and damaging the other 3. On the day of the fire Geer inquired of the compress company as to whether or not the cotton had been unloaded, and at the same time requested samples. He testified that it was not necessary for the cotton to be unloaded before it was sampled. At the time the samples were requested by Mr. Geer the cotton, in fact, had not been unloaded. After the request was made, T. E. Craig, the manager of the compress company, had his employés to get the cotton out of the cars, weigh it, and draw the samples. This was done in pursuance of the usual custom, except that it was done in compliance with request made by telephone. The proof shows that it was usual and customary for the railway company to give the compress company notice by means of what is described in appellees' pleadings as a "receiving slip," the notice being given in advance of actual delivery of the cotton to the compress company. The purpose of the notice seems to have been to enable the compress company to prepare for receiving and handling the cotton upon its arrival. The railroad company had no warehouse of its own at McKinney in which to store cotton, and used the compress company's premises exclusively for that purpose. Upon arrival of the cotton it was unloaded and weighed, weight sheets were made as the cotton was weighed, and in the weight sheet each bale was assigned a serial number; the weight sheet was made by the bookkeeper from the "receiving slip," a duplicate copy of which was first delivered to the compress company by the railroad company. The weight sheet was then delivered to the weigh master, who unloaded the cotton, weighed it, tagged it with the same serial number indicated in the weight sheet, and then redelivered the weight sheet to the compress company's office. There the bookkeeper wrote the same serial numbers contained in the weight sheet on form tickets, made a carbon copy of the weight sheet, and delivered the tickets with a copy of the weight sheet to the railroad company's agent. The agent then signed for these on the back of the original "receiving slip." The compress company then held the bales of cotton represented by the respective tickets so delivered

to the railroad company until these tickets were again presented to the compress company, whereupon the cotton would be delivered to whomsoever presented the tickets. The owner of the cotton, or whoever else had possession of the bill of lading, upon presenting it and paying the freight, received from the railroad company's representative the tickets made out as above stated and delivered to the possession of the railroad company. Actual possession of the cotton was acquired only upon presentation of the tickets to the compress company, and the tickets could be had for such presentation only from the railroad company.

It appears without dispute, as above stated, that, at the time the samples were requested by Geer, the cotton had not been unloaded from the car, and that the car was really not in position for unloading at that time or immediately thereafter when it was unloaded. The compress agent testified that the end of the car was beyond the wharf or cotton platform, and that the man who unloaded it used a grain door for a bridge from the door of the car to the compress platform. The compress company's agent did not know the car was there until about the middle of the morning of March 21st, when the samples were requested by Geer, and which, it will be borne in mind, was the day of the fire, and only three or four hours before the fire. After the cotton had been weighed and the samples taken, the bales were left on the corner of the platform, and nothing else toward carrying out the usual transactions preceding actual delivery to the owner was done before the fire.

The compress agent testified that no tickets had been issued or delivered to the railroad company for the cotton prior to the fire "because the bookkeeper had not gotten down to the point of making the tickets and delivering same to the railroad company before the fire occurred. The railroad agent had not signed his name on the back of the receiving slip because the tickets had not been delivered to him."

The agent of the compress company testified, without contradiction, as follows:

"It is a fact that the receiving slip was notice of the arrival, or purported arrival, of the cotton. The employees of the compress company would unload the cotton. The loading and unloading was always done by the employees of the compress company.

"I do not know the exact date I signed the receiving slip for this cotton. I presume it was when presented to me. Its presentation indicated to me to expect the cotton from the railway company. I had never received a bale of cotton when I signed the receipts. According to the general custom the receiving slip was signed by me before we received the cotton. At the time we actually received it the compress would execute the weight sheets and the tickets. The instruments delivered by the compress company to the railroad company evidencing the receipt of the cotton, according to the general custom, were the weight sheets and tickets."

The record reflects no contract or specific understanding between the compress company and appellees with reference to storing cotton, and, since the facts show without any dispute whatever that the railroad company had no warehouse at McKinney, and used the compress company's premises for the storage of cotton, we think it is clearly established that the compress company was the agent of the railroad company under the custom prevailing to unload and receive from cars cotton shipped to McKinney.

The pleadings and the facts in the record being as above indicated, the trial court instructed a verdict for appellees.

The only question we are called upon to determine is whether or not the undisputed facts in the case conclusively show that no delivery of the cotton had been made to appellees at the time of its destruction by fire. Our attention is called to no proof in the record sufficient to establish the railroad's liability as warehouseman, and the validity of the judgment accordingly depends altogether upon the sufficiency of the facts to establish appellees' contention that the cotton had not been delivered by the railroad company so as to relieve it of absolute liability as a carrier.

[1] We think the inescapable effect of the undisputed facts is to establish the legal conclusion that at the time the cotton was destroyed the delivery had not been completed by the railroad company, and that its liability as a common carrier still existed. The fact that appellees had obtained samples of the cotton only three or four hours before the fire for the purpose of making sale of it we do not think tends to prove delivery in the light of the entire record. As we construe the evidence, the samples might have been delivered to appellees the moment the cotton arrived in McKinney, and before any steps whatever had been taken to unload it. Under the proof, the duty to unload the cotton is placed upon the railroad company. It had made the compress company its agent for the purpose of unloading the cotton upon arrival, holding it pending the delivery of the tickets which it required to be made out and delivered to it. The "receiving slip" cannot be said to have constituted notice to appellees themselves, but was rather notice to the compress company as the agent of the railroad company to prepare to unload the cotton upon its arrival. The "receiving slip," as indicated by the evidence, seems to us to have been a means used to contribute to the efficient and rapid delivery of the shipment, rather than a notice of arrival given to the shipper.

[2] Had appellees failed or refused, beyond a reasonable period of time, to pay the

freight and receive the tickets held by the railroad company after notice of arrival of the shipment, then, under the law, the position of the railroad company, in such event, would have been only that of a warehouseman; but no construction of the evidence can establish a situation of this nature. Appellees did not have notice of the arrival of the shipment until about the middle of the forenoon of the day on which the fire occurred. The cotton had not then been unloaded. Within a very few hours after they had obtained knowledge of the arrival fire destroyed the cotton, and, under the proof with reference to usage and custom established without conflict, they, in the meantime, could not have obtained possession of the cotton, for the reason that the instruments required by the representatives of the railroad company to be delivered to them by the compress company precedent to delivery of the cotton to the owner had not been made. In these circumstances, we think it clear that the dominion of the railroad company as a carrier over the cotton was continuing at the time it was destroyed, and that, since it had not put the cotton in position so that it could have been delivered except for the failure of appellees to receive it, or for their refusing to receive it, its liability as a common carrier had not ceased and accordingly its absolute liability as an insurer was still continuing. Article 712, Revised Civil Statutes; Wichita Falls & Northwestern Ry. Co. v. Brown, 76 Okl. 84, 183 Pac. 889; So. Gro. Co. v. Bush, 131 Ark. 153, 198 S. W. 136; Hines, Director Gen. v. Steele, 224 S. W. 606.

The proof having established beyond controversy the fact that the cotton at the time of its destruction was still in the possession of the railroad company as a common carrier, and delivery in a legal sense not having been completed, accordingly, the judgment correctly determined the liability. The court therefore did not err in instructing the jury peremptorily to render a verdict for appellees, and the judgment is affirmed.

---

⬅══For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes